## SELL *v.* UNITED STATES

No. 02–5664.   Argued March 3, 2003—Decided June 16, 2003

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR and THOMAS, JJ., joined, *post,* p. 186.

*Barry A. Short,* by appointment of the Court, 537 U. S. 1087, argued the cause for petitioner. With him on the briefs were *Neal F. Perryman, Mark N. Light, Norman S. London,* and *Lee T. Lawless.*

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the briefs were *Solicitor*

*General Olson, Assistant Attorney General Chertoff, Lisa Schiavo Blatt,* and *Joseph C. Wyderko.**

JUSTICE BREYER delivered the opinion of the Court.

The question presented is whether the Constitution permits the Government to administer antipsychotic drugs involuntarily to a mentally ill criminal defendant—in order to render that defendant competent to stand trial for serious, but nonviolent, crimes. We conclude that the Constitution allows the Government to administer those drugs, even against the defendant's will, in limited circumstances, *i. e.,* upon satisfaction of conditions that we shall describe. Because the Court of Appeals did not find that the requisite circumstances existed in this case, we vacate its judgment.

I

A

Petitioner Charles Sell, once a practicing dentist, has a long and unfortunate history of mental illness. In September 1982, after telling doctors that the gold he used for fillings had been contaminated by communists, Sell was hospitalized, treated with antipsychotic medication, and subsequently discharged. App. 146. In June 1984, Sell called the police to say that a leopard was outside his office boarding a bus, and he then asked the police to shoot him. *Id.,* at 148; Record, Forensic Report, p. 1 (June 20, 1997) (Sealed). Sell

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union of Eastern Missouri by *Peter A. Joy;* for the Center for Cognitive Liberty & Ethics by *Richard Glen Boire;* for the Drug Policy Alliance by *David T. Goldberg* and *Daniel N. Abrahamson;* for the National Association of Criminal Defense Lawyers by *Burton H. Shostak;* for the New York State Association of Criminal Defense Lawyers by *Joshua L. Dratel;* and for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden.*

Briefs of *amici curiae* were filed for the American Psychological Association by *David W. Ogden, Paul R. Q. Wolfson,* and *Nathalie F. P. Gilfoyle;* and for the American Psychiatric Association et al. by *Richard G. Taranto.*

was again hospitalized and subsequently released. On various occasions, he complained that public officials, for example, a State Governor and a police chief, were trying to kill him. *Id.*, at 4. In April 1997, he told law enforcement personnel that he "spoke to God last night," and that "God told me every [Federal Bureau of Investigation] person I kill, a soul will be saved." *Id.*, at 1.

In May 1997, the Government charged Sell with submitting fictitious insurance claims for payment. See 18 U. S. C. § 1035(a)(2). A Federal Magistrate Judge (Magistrate), after ordering a psychiatric examination, found Sell "currently competent," but noted that Sell might experience "a psychotic episode" in the future. App. 321. The Magistrate released Sell on bail. A grand jury later produced a superseding indictment charging Sell and his wife with 56 counts of mail fraud, 6 counts of Medicaid fraud, and 1 count of money laundering. *Id.*, at 12–22.

In early 1998, the Government claimed that Sell had sought to intimidate a witness. The Magistrate held a bail revocation hearing. Sell's behavior at his initial appearance was, in the judge's words, "'totally out of control,'" involving "screaming and shouting," the use of "personal insults" and "racial epithets," and spitting "in the judge's face." *Id.*, at 322. A psychiatrist reported that Sell could not sleep because he expected the Federal Bureau of Investigation (FBI) to "'come busting through the door,'" and concluded that Sell's condition had worsened. *Ibid.* After considering that report and other testimony, the Magistrate revoked Sell's bail.

In April 1998, the grand jury issued a new indictment charging Sell with attempting to murder the FBI agent who had arrested him and a former employee who planned to testify against him in the fraud case. *Id.*, at 23–29. The attempted murder and fraud cases were joined for trial.

In early 1999, Sell asked the Magistrate to reconsider his competence to stand trial. The Magistrate sent Sell to the

United States Medical Center for Federal Prisoners (Medical Center) at Springfield, Missouri, for examination. Subsequently the Magistrate found that Sell was "mentally incompetent to stand trial." *Id.*, at 323. He ordered Sell to "be hospitalized for treatment" at the Medical Center for up to four months, "to determine whether there was a substantial probability that [Sell] would attain the capacity to allow his trial to proceed." *Ibid.*

Two months later, Medical Center staff recommended that Sell take antipsychotic medication. Sell refused to do so. The staff sought permission to administer the medication against Sell's will. That effort is the subject of the present proceedings.

## B

We here review the last of five hierarchically ordered lower court and Medical Center determinations. First, in June 1999, Medical Center staff sought permission from institutional authorities to administer antipsychotic drugs to Sell involuntarily. A reviewing psychiatrist held a hearing and considered Sell's prior history; Sell's current persecutional beliefs (for example, that Government officials were trying to suppress his knowledge about events in Waco, Texas, and had sent him to Alaska to silence him); staff medical opinions (for example, that "Sell's symptoms point to a diagnosis of Delusional Disorder but . . . there well may be an underlying Schizophrenic Process"); staff medical concerns (for example, about "the persistence of Dr. Sell's belief that the Courts, FBI, and federal government in general are against him"); an outside medical expert's opinion (that Sell suffered only from delusional disorder, which, in that expert's view, "medication rarely helps"); and Sell's own views, as well as those of other laypersons who know him (to the effect that he did not suffer from a serious mental illness). *Id.*, at 147–150.

The reviewing psychiatrist then authorized involuntary administration of the drugs, both (1) because Sell was "men-

tally ill and dangerous, and medication is necessary to treat the mental illness," and (2) so that Sell would "become competent for trial." *Id.*, at 145. The reviewing psychiatrist added that he considered Sell "dangerous based on threats and delusions if outside, but not necessarily in[side] prison" and that Sell was "[a]ble to function" in prison in the "open population." *Id.*, at 144.

Second, the Medical Center administratively reviewed the determination of its reviewing psychiatrist. A Bureau of Prisons official considered the evidence that had been presented at the initial hearing, referred to Sell's delusions, noted differences of professional opinion as to proper classification and treatment, and concluded that antipsychotic medication represents the medical intervention "most likely" to "ameliorate" Sell's symptoms; that other "less restrictive interventions" are "unlikely" to work; and that Sell's "pervasive belief" that he was "being targeted for nefarious actions by various governmental . . . parties," along with the "current charges of conspiracy to commit murder," made Sell "a potential risk to the safety of one or more others in the community." *Id.*, at 154–155. The reviewing official "upheld" the "hearing officer's decision that [Sell] would benefit from the utilization of anti-psychotic medication." *Id.*, at 157.

Third, in July 1999, Sell filed a court motion contesting the Medical Center's right involuntarily to administer antipsychotic drugs. In September 1999, the Magistrate who had ordered Sell sent to the Medical Center held a hearing. The evidence introduced at the hearing for the most part replicated the evidence introduced at the administrative hearing, with two exceptions. First, the witnesses explored the question of the medication's effectiveness more thoroughly. Second, Medical Center doctors testified about an incident that took place at the Medical Center *after* the administrative proceedings were completed. In July 1999, Sell had approached one of the Medical Center's nurses, sug-

gested that he was in love with her, criticized her for having nothing to do with him, and, when told that his behavior was inappropriate, added " 'I can't help it.' " *Id.*, at 168–170, 325. He subsequently made remarks or acted in ways indicating that this kind of conduct would continue. The Medical Center doctors testified that, given Sell's prior behavior, diagnosis, and current beliefs, boundary-breaching incidents of this sort were not harmless and, when coupled with Sell's inability or unwillingness to desist, indicated that he was a safety risk even within the institution. They added that he had been moved to a locked cell.

In August 2000, the Magistrate found that "the government has made a substantial and very strong showing that Dr. Sell is a danger to himself and others at the institution in which he is currently incarcerated"; that "the government has shown that anti-psychotic medication is the only way to render him less dangerous"; that newer drugs and/or changing drugs will "ameliorat[e]" any "serious side effects"; that "the benefits to Dr. Sell . . . far outweigh any risks"; and that "there is a substantial probability that" the drugs will "retur[n]" Sell "to competency." *Id.*, at 333–334. The Magistrate concluded that "the government has shown in as strong a manner as possible, that anti-psychotic medications are the only way to render the defendant not dangerous and competent to stand trial." *Id.*, at 335. The Magistrate issued an order authorizing the involuntary administration of antipsychotic drugs to Sell, *id.*, at 331, but stayed that order to allow Sell to appeal the matter to the Federal District Court, *id.*, at 337.

Fourth, the District Court reviewed the record and, in April 2001, issued an opinion. The court addressed the Magistrate's finding "that defendant presents a danger to himself or others sufficient" to warrant involuntary administration of antipsychotic drugs. *Id.*, at 349. After noting that Sell subsequently had "been returned to an open ward," the District Court held the Magistrate's "dangerousness"

finding "clearly erroneous." *Id.*, at 349, and n. 5. The court limited its determination to Sell's "dangerousness *at this time* to himself and to those around him *in his institutional context.*" *Id.*, at 349 (emphasis in original).

Nonetheless, the District Court *affirmed* the Magistrate's order permitting Sell's involuntary medication. The court wrote that "anti-psychotic drugs are medically appropriate," that "they represent the only viable hope of rendering defendant competent to stand trial," and that "administration of such drugs appears necessary to serve the government's compelling interest in obtaining an adjudication of defendant's guilt or innocence of numerous and serious charges" (including fraud and attempted murder). *Id.*, at 354. The court added that it was "premature" to consider whether "the effects of medication might prejudice [Sell's] defense at trial." *Id.*, at 351, 352. The Government and Sell both appealed.

Fifth, in March 2002, a divided panel of the Court of Appeals affirmed the District Court's judgment. 282 F. 3d 560 (CA8). The majority affirmed the District Court's determination that Sell was not dangerous. The majority noted that, according to the District Court, Sell's behavior at the Medical Center "amounted at most to an 'inappropriate familiarity and even infatuation' with a nurse." *Id.*, at 565. The Court of Appeals agreed, "[u]pon review," that "the evidence does not support a finding that Sell posed a danger to himself or others at the Medical Center." *Ibid.*

The Court of Appeals also affirmed the District Court's order requiring medication in order to render Sell competent to stand trial. Focusing solely on the serious fraud charges, the panel majority concluded that the "government has an essential interest in bringing a defendant to trial." *Id.*, at 568. It added that the District Court "correctly concluded that there were no less intrusive means." *Ibid.* After reviewing the conflicting views of the experts, *id.*, at 568–571, the panel majority found antipsychotic drug treatment "med-

ically appropriate" for Sell, *id.*, at 571. It added that the "medical evidence presented indicated a reasonable probability that Sell will fairly be able to participate in his trial." *Id.*, at 572. One member of the panel dissented primarily on the ground that the fraud and money laundering charges were "not serious enough to warrant the forced medication of the defendant." *Id.*, at 574 (opinion of Bye, J.).

We granted certiorari to determine whether the Eighth Circuit "erred in rejecting" Sell's argument that "allowing the government to administer antipsychotic medication against his will solely to render him competent to stand trial for non-violent offenses," Brief for Petitioner i, violated the Constitution—in effect by improperly depriving Sell of an important "liberty" that the Constitution guarantees, Amdt. 5.

## II

We first examine whether the Eighth Circuit had jurisdiction to decide Sell's appeal. The District Court's judgment, from which Sell had appealed, was a pretrial order. That judgment affirmed a Magistrate's order requiring Sell involuntarily to receive medication. The Magistrate entered that order pursuant to an earlier delegation from the District Court of legal authority to conduct pretrial proceedings. App. 340; see 28 U. S. C. § 636(b)(1)(A). The order embodied legal conclusions related to the Medical Center's administrative efforts to medicate Sell; these efforts grew out of Sell's provisional commitment; and that provisional commitment took place pursuant to an earlier Magistrate's order seeking a medical determination about Sell's future competence to stand trial. Cf. *Riggins* v. *Nevada*, 504 U. S. 127 (1992) (reviewing, as part of criminal proceeding, trial court's denial of defendant's motion to discontinue medication); *Stack* v. *Boyle*, 342 U. S. 1, 6–7 (1951) (district court's denial of defendant's motion to reduce bail is part of criminal proceeding and is not reviewable in separate habeas action).

How was it possible for Sell to appeal from such an order? The law normally requires a defendant to wait until the end of the trial to obtain appellate review of a pretrial order. The relevant jurisdictional statute, 28 U. S. C. § 1291, authorizes federal courts of appeals to review "*final* decisions of the district courts." (Emphasis added.) And the term "final decision" normally refers to a final judgment, such as a judgment of guilt, that terminates a criminal proceeding.

Nonetheless, there are exceptions to this rule. The Court has held that a preliminary or interim decision is appealable as a "collateral order" when it (1) "conclusively determine[s] the disputed question," (2) "resolve[s] an important issue completely separate from the merits of the action," and (3) is "effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand* v. *Livesay,* 437 U. S. 463, 468 (1978). And this District Court order does appear to fall within the "collateral order" exception.

The order (1) "conclusively determine[s] the disputed question," namely, whether Sell has a legal right to avoid forced medication. *Ibid.* The order also (2) "resolve[s] an important issue," for, as this Court's cases make clear, involuntary medical treatment raises questions of clear constitutional importance. *Ibid.* See *Winston* v. *Lee,* 470 U. S. 753, 759 (1985) ("A compelled surgical intrusion into an individual's body . . . implicates expectations of privacy and security" of great magnitude); see also *Riggins, supra,* at 133–134; *Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S. 261, 278–279 (1990); *Washington* v. *Harper,* 494 U. S. 210, 221–222 (1990). At the same time, the basic issue—whether Sell must undergo medication against his will—is "completely separate from the merits of the action," *i. e.,* whether Sell is guilty or innocent of the crimes charged. *Coopers & Lybrand,* 437 U. S., at 468. The issue is wholly separate as well from questions concerning trial procedures. Finally, the issue is (3) "effectively unreviewable on appeal from a final judgment." *Ibid.* By the time of trial Sell will have undergone

forced medication—the very harm that he seeks to avoid. He cannot undo that harm even if he is acquitted. Indeed, if he is acquitted, there will be no appeal through which he might obtain review. Cf. *Stack, supra,* at 6–7 (permitting appeal of order setting high bail as "collateral order"). These considerations, particularly those involving the severity of the intrusion and corresponding importance of the constitutional issue, readily distinguish Sell's case from the examples raised by the dissent. See *post,* at 191–192 (opinion of SCALIA, J.).

We add that the question presented here, whether Sell has a legal right to avoid forced medication, perhaps in part because medication may make a trial unfair, differs from the question whether forced medication *did* make a trial unfair. The first question focuses upon the right to avoid administration of the drugs. What may happen at trial is relevant, but only as a prediction. See *infra,* at 181. The second question focuses upon the right to a fair trial. It asks what *did* happen as a result of having administered the medication. An ordinary appeal comes too late for a defendant to enforce the first right; an ordinary appeal permits vindication of the second.

We conclude that the District Court order from which Sell appealed was an appealable "collateral order." The Eighth Circuit had jurisdiction to hear the appeal. And we consequently have jurisdiction to decide the question presented, whether involuntary medication violates Sell's constitutional rights.

### III

We turn now to the basic question presented: Does forced administration of antipsychotic drugs to render Sell competent to stand trial unconstitutionally deprive him of his "liberty" to reject medical treatment? U. S. Const., Amdt. 5 (Federal Government may not "depriv[e]" any person of "liberty . . . without due process of law"). Two prior prece-

dents, *Harper, supra,* and *Riggins* v. *Nevada,* 504 U. S. 127 (1992), set forth the framework for determining the legal answer.

In *Harper,* this Court recognized that an individual has a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs." 494 U. S., at 221. The Court considered a state law authorizing forced administration of those drugs "to inmates who are . . . gravely disabled or represent a significant danger to themselves or others." *Id.,* at 226. The State had established "by a medical finding" that Harper, a mentally ill prison inmate, had "a mental disorder . . . which is likely to cause harm if not treated." *Id.,* at 222. The treatment decision had been made "by a psychiatrist," it had been approved by "a reviewing psychiatrist," and it "ordered" medication only because that was "in the prisoner's medical interests, given the legitimate needs of his institutional confinement." *Ibid.*

The Court found that the State's interest in administering medication was "legitima[te]" and "importan[t]," *id.,* at 225; and it held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest," *id.,* at 227. The Court concluded that, in the circumstances, the state law authorizing involuntary treatment amounted to a constitutionally permissible "accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others." *Id.,* at 236.

In *Riggins,* the Court repeated that an individual has a constitutionally protected liberty "interest in avoiding involuntary administration of antipsychotic drugs"—an interest

that only an "essential" or "overriding" state interest might overcome. 504 U. S., at 134, 135. The Court suggested that, in principle, forced medication in order to render a defendant competent to stand trial for murder was constitutionally permissible. The Court, citing *Harper*, noted that the State "would have satisfied due process if the prosecution had demonstrated . . . that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' *own safety or the safety of others*." 504 U. S., at 135 (emphasis added). And it said that the State "*[s]imilarly* . . . might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence" of the murder charge "by using less intrusive means." *Ibid.* (emphasis added). Because the trial court had permitted forced medication of Riggins without taking account of his "liberty interest," with a consequent possibility of trial prejudice, the Court reversed Riggins' conviction and remanded for further proceedings. *Id.*, at 137–138. JUSTICE KENNEDY, concurring in the judgment, emphasized that antipsychotic drugs might have side effects that would interfere with the defendant's ability to receive a fair trial. *Id.*, at 145 (finding forced medication likely justified only where State shows drugs would not significantly affect defendant's "behavior and demeanor").

These two cases, *Harper* and *Riggins*, indicate that the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

This standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances. But those instances may be rare. That is because the standard says or fairly implies the following:

First, a court must find that *important* governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government seeks to protect through application of the criminal law the basic human need for security. See *Riggins, supra,* at 135–136 ("'[P]ower to bring an accused to trial is fundamental to a scheme of "ordered·liberty" and prerequisite to social justice and peace'" (quoting *Illinois* v. *Allen,* 397 U. S. 337, 347 (1970) (Brennan, J., concurring))).

Courts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime. We do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecution. And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost. The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U. S. C. § 3585(b)). Moreover, the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one.

Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. See *Riggins*, 504 U. S., at 142–145 (KENNEDY, J., concurring in judgment).

Third, the court must conclude that involuntary medication is *necessary* to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. Cf. Brief for American Psychological Association as *Amicus Curiae* 10–14 (nondrug therapies may be effective in restoring psychotic defendants to competence); but cf. Brief for American Psychiatric Association et al. as *Amici Curiae* 13–22 (alternative treatments for psychosis commonly not as effective as medication). And the court must consider less intrusive means for administering the drugs, *e. g.*, a court order to the defendant backed by the contempt power, before considering more intrusive methods.

Fourth, as we have said, the court must conclude that administration of the drugs is *medically appropriate, i. e.*, in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success.

We emphasize that the court applying these standards is seeking to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant *competent to stand trial.* A court need not consider whether to allow forced medication for that kind of purpose,

if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk. 494 U. S., at 225–226. There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question.

For one thing, the inquiry into whether medication is permissible, say, to render an individual nondangerous is usually more "objective and manageable" than the inquiry into whether medication is permissible to render a defendant competent. *Riggins, supra,* at 140 (KENNEDY, J., concurring in judgment). The medical experts may find it easier to provide an informed opinion about whether, given the risk of side effects, particular drugs are medically appropriate and necessary to control a patient's potentially dangerous behavior (or to avoid serious harm to the patient himself) than to try to balance harms and benefits related to the more quintessentially legal questions of trial fairness and competence.

For another thing, courts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, *Harper*-type grounds. Every State provides avenues through which, for example, a doctor or institution can seek appointment of a guardian with the power to make a decision authorizing medication—when in the best interests of a patient who lacks the mental competence to make such a decision. *E. g.,* Ala. Code §§ 26–2A–102(a), 26–2A–105, 26–2A–108 (West 1992); Alaska Stat. §§ 13.26.105(a), 13.26.116(b) (2002); Ariz. Rev. Stat. Ann. §§ 14–5303, 14–5312 (West 1995); Ark. Code Ann. §§ 28–65–205, 28–65–301 (1987). And courts, in civil proceedings, may authorize involuntary medication where the patient's failure to accept treatment threatens injury to the patient or others. See, *e. g.,* 28 CFR § 549.43 (2002); cf. 18 U. S. C. § 4246.

If a court authorizes medication on these alternative grounds, the need to consider authorization on trial competence grounds will likely disappear. Even if a court decides medication cannot be authorized on the alternative grounds, the findings underlying such a decision will help to inform expert opinion and judicial decisionmaking in respect to a request to administer drugs for trial competence purposes. At the least, they will facilitate direct medical and legal focus upon such questions as: Why is it medically appropriate forcibly to administer antipsychotic drugs to an individual who (1) is *not* dangerous *and* (2) *is* competent to make up his own mind about treatment? Can bringing such an individual to trial *alone* justify in whole (or at least in significant part) administration of a drug that may have adverse side effects, including side effects that may to some extent impair a defense at trial? We consequently believe that a court, asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand trial, should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other *Harper*-type grounds; and, if not, why not.

When a court must nonetheless reach the trial competence question, the factors discussed above, *supra*, at 180–181, should help it make the ultimate constitutionally required judgment. Has the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it? See *Harper, supra,* at 221–223; *Riggins, supra,* at 134–135.

## IV

The Medical Center and the Magistrate in this case, applying standards roughly comparable to those set forth here and in *Harper,* approved forced medication substantially, if not primarily, upon grounds of Sell's dangerousness to oth-

ers.  But the District Court and the Eighth Circuit took a different approach.  The District Court found "clearly erroneous" the Magistrate's conclusion regarding dangerousness, and the Court of Appeals agreed.  Both courts approved forced medication solely in order to render Sell competent to stand trial.

We shall assume that the Court of Appeals' conclusion about Sell's dangerousness was correct.  But we make that assumption *only* because the Government did not contest, and the parties have not argued, that particular matter.  If anything, the record before us, described in Part I, suggests the contrary.

The Court of Appeals apparently agreed with the District Court that "Sell's inappropriate behavior . . . amounted at most to an 'inappropriate familiarity and even infatuation' with a nurse."  282 F. 3d, at 565.  That being so, it also agreed that "the evidence does not support a finding that Sell posed a danger to himself or others at the Medical Center."  *Ibid.*  The Court of Appeals, however, did not discuss the potential differences (described by a psychiatrist testifying before the Magistrate) between ordinary "overfamiliarity" and the same conduct engaged in persistently by a patient with Sell's behavioral history and mental illness. Nor did it explain why those differences should be minimized in light of the fact that the testifying psychiatrists concluded that Sell was dangerous, while Sell's own expert denied, not Sell's dangerousness, but the efficacy of the drugs proposed for treatment.

The District Court's opinion, while more thorough, places weight upon the Medical Center's decision, taken after the Magistrate's hearing, to return Sell to the general prison population.  It does not explain whether that return reflected an improvement in Sell's condition or whether the Medical Center saw it as permanent rather than temporary. Cf. *Harper, supra,* at 227, and n. 10 (indicating that physical

restraints and seclusion often not acceptable substitutes for medication).

Regardless, as we have said, we must assume that Sell was not dangerous. And on that hypothetical assumption, we find that the Court of Appeals was wrong to approve forced medication solely to render Sell competent to stand trial. For one thing, the Magistrate's opinion makes clear that he did *not* find forced medication legally justified on trial competence grounds alone. Rather, the Magistrate concluded that Sell *was* dangerous, and he wrote that forced medication was "the only way to render the defendant *not dangerous and* competent to stand trial." App. 335 (emphasis added).

Moreover, the record of the hearing before the Magistrate shows that the experts themselves focused mainly upon the dangerousness issue. Consequently the experts did not pose important questions—questions, for example, about trial-related side effects and risks—the answers to which could have helped determine whether forced medication was warranted on trial competence grounds alone. Rather, the Medical Center's experts conceded that their proposed medications had "significant" side effects and that "there has to be a cost benefit analysis." *Id.,* at 185 (testimony of Dr. DeMier); *id.,* at 236 (testimony of Dr. Wolfson). And in making their "cost-benefit" judgments, they primarily took into account Sell's dangerousness, not the need to bring him to trial.

The failure to focus upon trial competence could well have mattered. Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence, *Riggins,* 504 U. S., at 142–145 (KENNEDY, J., concurring in judgment), but not necessarily relevant when dangerousness is primarily at issue. We cannot tell whether

the side effects of antipsychotic medication were likely to undermine the fairness of a trial in Sell's case.

Finally, the lower courts did not consider that Sell has already been confined at the Medical Center for a long period of time, and that his refusal to take antipsychotic drugs might result in further lengthy confinement. Those factors, the first because a defendant ordinarily receives credit toward a sentence for time served, 18 U. S. C. § 3585(b), and the second because it reduces the likelihood of the defendant's committing future crimes, moderate—though they do not eliminate—the importance of the governmental interest in prosecution. See *supra*, at 180.

## V

For these reasons, we believe that the present orders authorizing forced administration of antipsychotic drugs cannot stand. The Government may pursue its request for forced medication on the grounds discussed in this opinion, including grounds related to the danger Sell poses to himself or others. Since Sell's medical condition may have changed over time, the Government should do so on the basis of current circumstances.

The judgment of the Eighth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, dissenting.

The District Court never entered a final judgment in this case, which should have led the Court of Appeals to wonder whether it had any business entertaining petitioner's appeal. Instead, without so much as acknowledging that Congress has limited court-of-appeals jurisdiction to "appeals from all *final decisions* of the district courts of the United States," 28 U. S. C. § 1291 (emphasis added), and appeals from certain specified interlocutory orders, see § 1292, the Court of Ap-

peals proceeded to the merits of Sell's interlocutory appeal. 282 F. 3d 560 (CA8 2002). Perhaps this failure to discuss jurisdiction was attributable to the United States' refusal to contest the point there (as it has refused here, see Brief for United States 10, n. 5), or to the panel's unexpressed agreement with the conclusion reached by other Courts of Appeals, that pretrial forced-medication orders are appealable under the "collateral order doctrine," see, e. g., *United States v. Morgan*, 193 F. 3d 252, 258–259 (CA4 1999); *United States v. Brandon*, 158 F. 3d 947, 950–951 (CA6 1998). But *this* Court's cases do not authorize appeal from the District Court's April 4, 2001, order, which was neither a "final decision" under § 1291 nor part of the class of specified interlocutory orders in § 1292. We therefore lack jurisdiction, and I would vacate the Court of Appeals' decision and remand with instructions to dismiss.

I

After petitioner's indictment, a Magistrate Judge found that petitioner was incompetent to stand trial because he was unable to understand the nature and consequences of the proceedings against him and to assist in his defense. As required by 18 U. S. C. § 4241(d), the Magistrate Judge committed petitioner to the custody of the Attorney General, and petitioner was hospitalized to determine whether there was a substantial probability that in the foreseeable future he would attain the capacity to stand trial. On June 9, 1999, a reviewing psychiatrist determined, after a § 549.43 administrative hearing,[1] that petitioner should be required to take

---

[1] Title 28 CFR § 549.43 (2002) provides the standards and procedures used to determine whether a person in the custody of the Attorney General may be involuntarily medicated. Before that can be done, a reviewing psychiatrist must determine that it is "necessary in order to attempt to make the inmate competent for trial or is necessary because the inmate is dangerous to self or others, is gravely disabled, or is unable to function in the open population of a mental health referral center or a regular prison," § 549.43(a)(5).

antipsychotic medication, finding the medication necessary to render petitioner competent for trial and medically appropriate to treat his mental illness. Petitioner's administrative appeal from that decision[2] was denied with a written statement of reasons.

At that point the Government possessed the requisite authority to administer forced medication. Petitioner responded, not by appealing to the courts the § 549.43 administrative determination, see 5 U. S. C. § 702, but by moving in the District Court overseeing his criminal prosecution for a *hearing* regarding the appropriateness of his medication. A Magistrate Judge granted the motion and held a hearing. The Government then requested from the Magistrate Judge an order authorizing the involuntary medication of petitioner, which the Magistrate Judge entered.[3] On April 4, 2001, the District Court affirmed this Magistrate Judge's order, and it is from *this* order that petitioner appealed to the Eighth Circuit.

## II

### A

Petitioner and the United States maintain that 28 U. S. C. § 1291, which permits the courts of appeals to review "all

---

[2] Section 549.43(a)(6) provides: "The inmate . . . may submit an appeal to the institution mental health division administrator regarding the decision within 24 hours of the decision and . . . the administrator shall review the decision within 24 hours of the inmate's appeal."

[3] It is not apparent why this order was necessary, since the Government had *already* received authorization to medicate petitioner pursuant to § 549.43. If the Magistrate Judge had denied the Government's motion (or if this Court were to reverse the Magistrate Judge's order) the Bureau of Prisons' administrative decision ordering petitioner's forcible medication would remain in place. Which is to suggest that, in addition to the jurisdictional defect of interlocutoriness to which my opinion is addressed, there may be no jurisdiction because, at the time this suit was filed, petitioner failed to meet the "remediability" requirement of Article III standing. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83 (1998). The Court of Appeals should address this jurisdictional issue on remand.

*final decisions* of the district courts of the United States" (emphasis added), allowed the Court of Appeals to review the District Court's April 4, 2001, order. We have described § 1291, however, as a "final judgment rule," *Flanagan* v. *United States*, 465 U. S. 259, 263 (1984), which "[i]n a criminal case . . . prohibits appellate review *until conviction and imposition of sentence*," *ibid.* (emphasis added). See also *Abney* v. *United States*, 431 U. S. 651, 656–657 (1977). We have invented[4] a narrow exception to this statutory command: the so-called "collateral order" doctrine, which permits appeal of district court orders that (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," *and* (3) are "effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 468 (1978). But the District Court's April 4, 2001, order fails to satisfy the third requirement of this test.

Our decision in *Riggins* v. *Nevada*, 504 U. S. 127 (1992), demonstrates that the District Court's April 4, 2001, order *is* reviewable on appeal from conviction and sentence. The defendant in *Riggins* had been involuntarily medicated while a pretrial detainee, and he argued, *on appeal from his murder conviction*, that the State of Nevada had contravened the substantive-due-process standards set forth in *Washington* v. *Harper*, 494 U. S. 210 (1990). Rather than holding that review of this claim was not possible on appeal from a criminal conviction, the *Riggins* Court held that forced medication of a criminal defendant that fails to comply with *Harper* creates an unacceptable risk of trial error and entitles the defendant to automatic vacatur of his conviction. 504 U. S., at 135–138. The Court is therefore wrong to say that "[a]n ordinary appeal comes too late for a defendant to enforce" this right, *ante*, at 177, and appellate review of any substantive-due-process challenge to the District Court's

---

[4] I use the term "invented" advisedly. The statutory text provides no basis.

April 4, 2001, order must wait until after conviction and sentence have been imposed.[5]

It is true that, if petitioner must wait until final judgment to appeal, he will not receive the *type* of remedy he would prefer—a predeprivation injunction rather than the postdeprivation vacatur of conviction provided by *Riggins*. But *that* ground for interlocutory appeal is emphatically rejected by our cases. See, *e. g., Flanagan, supra* (disallowing interlocutory appeal of an order disqualifying defense counsel); *United States* v. *Hollywood Motor Car Co.*, 458 U. S. 263 (1982) *(per curiam)* (disallowing interlocutory appeal of an order denying motion to dismiss indictment on grounds of prosecutorial vindictiveness); *Carroll* v. *United States*, 354 U. S. 394 (1957) (disallowing interlocutory appeal of an order denying motion to suppress evidence).

We have until today interpreted the collateral-order exception to § 1291 " 'with the *utmost strictness*' " in criminal cases. *Midland Asphalt Corp.* v. *United States*, 489 U. S. 794, 799 (1989) (emphasis added). In the 54 years since we invented the exception, see *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541 (1949), we have found only three types of prejudgment orders in criminal cases appealable: denials of motions to reduce bail, *Stack* v. *Boyle*, 342 U. S. 1 (1951), denials of motions to dismiss on double-jeopardy grounds, *Abney, supra,* and denials of motions to dismiss under the Speech or Debate Clause, *Helstoski* v. *Meanor*, 442 U. S. 500 (1979). The first of these exceptions was justified on the ground that the denial of a motion to reduce bail becomes moot (and thus effectively unreviewable) on appeal

---

[5] To be sure, the order here is unreviewable after final judgment *if the defendant is acquitted.* But the "unreviewability" leg of our collateral-order doctrine—which, as it is framed, requires that the interlocutory order be "effectively unreviewable *on appeal from a final judgment,"* *Coopers & Lybrand* v. *Livesay,* 437 U. S. 463, 468 (1978) (emphasis added)—is not satisfied by the possibility that the aggrieved party will have no occasion to appeal.

from conviction. See *Flanagan, supra,* at 266. As *Riggins* demonstrates, that is not the case here. The interlocutory appeals in *Abney* and *Helstoski* were justified on the ground that it was appropriate to interrupt the trial when the precise right asserted was the *right not to be tried.* See *Abney, supra,* at 660–661; *Helstoski, supra,* at 507–508. Petitioner does not assert a right not to be tried, but a right not to be *medicated.*

## B

Today's narrow holding will allow criminal defendants in petitioner's position to engage in opportunistic behavior. They can, for example, voluntarily take their medication until halfway through trial, then abruptly refuse and demand an interlocutory appeal from the order that medication continue on a compulsory basis. This sort of concern for the disruption of criminal proceedings—strangely missing from the Court's discussion today—is what has led us to state many times that we interpret the collateral-order exception narrowly in criminal cases. See *Midland Asphalt Corp., supra,* at 799; *Flanagan,* 465 U. S., at 264.

But the adverse effects of today's narrow holding are as nothing compared to the adverse effects of the new rule of law that underlies the holding. The Court's opinion announces that appellate jurisdiction is proper because review after conviction and sentence will come only after "Sell will have undergone forced medication—the very harm that he seeks to avoid." *Ante,* at 176–177. This analysis effects a breathtaking expansion of appellate jurisdiction over interlocutory orders. If it is applied faithfully (and some appellate panels will be eager to apply it faithfully), any criminal defendant who asserts that a trial court order will, if implemented, cause an immediate violation of his constitutional (or perhaps even statutory?) rights may immediately appeal. He is empowered to hold up the trial for months by claiming that review after final judgment "would come too late" to prevent the violation. A trial-court order requiring the de-

fendant to wear an electronic bracelet could be attacked as an immediate infringement of the constitutional right to "bodily integrity"; an order refusing to allow the defendant to wear a T-shirt that says "Black Power" in front of the jury could be attacked as an immediate violation of First Amendment rights; and an order compelling testimony could be attacked as an immediate denial of Fifth Amendment rights. All these orders would be immediately appealable. *Flanagan* and *Carroll,* which held that appellate review of orders that might infringe a defendant's constitutionally protected rights *still* had to wait until final judgment, are seemingly overruled. The narrow gate of entry to the collateral-order doctrine—hitherto traversable by only (1) orders unreviewable on appeal from judgment and (2) orders denying an asserted right not to be tried—has been generously widened.

The Court dismisses these concerns in a single sentence immediately following its assertion that the order here meets the three *Cohen*-exception requirements of (1) conclusively determining the disputed question (correct); (2) resolving an important issue separate from the merits of the action (correct); and (3) being unreviewable on appeal (quite plainly incorrect). That sentence reads as follows: "These considerations, particularly those involving the severity of the intrusion and corresponding importance of the constitutional issue, readily distinguish Sell's case from the examples raised by the dissent." *Ante,* at 177. That is a brand new consideration put forward in rebuttal, not at all discussed in the body of the Court's analysis, which relies on the ground that (contrary to my contention) this order *is not reviewable on appeal.* The Court's last-minute addition must mean that it is revising the *Cohen* test, to dispense with the third requirement (unreviewable on appeal) *only when the important separate issue in question involves a "severe intrusion" and hence an "important constitutional issue."* Of course I welcome this narrowing of a misguided revision—but I still

would not favor the revision, not only because it is a novelty with no basis in our prior opinions, but also because of the uncertainty, and the obvious opportunity for gamesmanship, that the revision-as-narrowed produces. If, however, I did make this more limited addition to the textually unsupported *Cohen* doctrine, I would at least do so in an undisguised fashion.

*     *     *

Petitioner could have obtained pre-trial review of the § 549.43 medication order by filing suit under the Administrative Procedure Act, 5 U. S. C. § 551 *et seq.*, or even by filing a *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), action, which is available to federal pretrial detainees challenging the conditions of their confinement, see, *e. g., Lyons* v. *United States Marshals*, 840 F. 2d 202 (CA3 1987). In such a suit, he could have obtained immediate appellate review of denial of relief.[6] But if he chooses to challenge his forced medication in the context of a criminal trial, he must abide by the limitations attached to such a challenge—which prevent him from stopping the proceedings in their tracks. Petitioner's mistaken litigation strategy, and this Court's desire to decide an interesting constitutional issue, do not justify a disregard of the limits that Congress has imposed on courts of appeals' (and our own) jurisdiction. We should vacate the judgment here, and remand the case to the Court of Appeals with instructions to dismiss.

---

[6] Petitioner points out that there are disadvantages to such an approach—for example, lack of constitutional entitlement to appointed counsel in a *Bivens* action. That does not entitle him or us to disregard the limits on appellate jurisdiction.