# NO. 12-08-00380-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *THE STATE OF TEXAS FOR* | § | *APPEAL FROM THE* |
| *THE BEST INTEREST AND* | § | *COUNTY COURT AT LAW* |
| *PROTECTION OF W.S.* | § | *CHEROKEE COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

W.S. appeals from an order authorizing the administration of psychoactive medication-forensic. In his sole issue, W.S. argues that the trial court erred in granting the order based upon the United States Supreme Court's opinion in ***Sell v. United States***, 539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003). We affirm.

### BACKGROUND

On September 3, 2008, an application for an order to administer psychoactive medication-forensic was filed by David Self, M.D. In the application, Self stated that W.S. was subject to an order dated August 11 for court ordered inpatient mental health services under Chapter 46B of the Texas Code of Criminal Procedure because he had been found incompetent to stand trial. Self stated that W.S. had been diagnosed with psychosis, not otherwise specified. Self wanted the trial court to compel W.S. to take four psychoactive medications: an antidepressant, an anxoilytic/sedative/hypnotic, a mood stabilizer, and an antipsychotic. Self stated that W.S. refused to take the medications voluntarily and that he believed W.S. lacked the capacity to make a decision regarding administration of psychoactive medications because he has "dense denial of illness," and delusional beliefs that impair his judgment.

Self determined that the proposed medications are the proper course of treatment for W.S. and that, if he were treated with the medications, his prognosis would be improved. However, Self believed that, if W.S. was not administered the medications, the consequences would be prolonged hospitalization. Self considered other medical alternatives to psychoactive medication, but determined that those alternatives would not be as effective. He also considered less intrusive treatments likely to secure W.S.'s agreement to take the psychoactive medications. Finally, Self believed that the benefits of the psychoactive medications outweighed the risks in relation to present medical treatment and W.S.'s best interest.

On September 9, the trial court held a hearing on the application. Self testified that he was W.S.'s treating physician and that W.S. was currently under court ordered mental health services under Chapter 46B because he had been found incompetent to stand trial. Self stated that W.S. verbally refused to accept medications voluntarily. He testified that he believes W.S. lacks the capacity to make a decision regarding the administration of psychoactive medications because W.S. completely lacks insight into the presence of mental illness, expresses denial of any mental illness, and has delusional beliefs of a grandiose nature that impair his judgment. Self stated that he completed the application for psychoactive medications and that W.S. suffers from psychosis, not otherwise specified. Self testified that, indicative of his mental illness, W.S. had become quite agitated and had been verbally threatening on more than one occasion. When confronted by Self's belief that he has a mental illness, W.S. verbalizes grandiose delusional beliefs. He also has a "lability to his mood," or changes a great deal, and has an abnormal intensity to his mood in response to stimuli that usually would not be exciting towards people. Self also stated that W.S. "tends towards the angry, threatening side of things."

Self testified that the classifications of medications listed in the exhibit attached to the application are in the proper course of treatment and in W.S.'s best interest. Self stated that the benefits of using these medications outweigh the risks with judicious monitoring and management of medications. Self was aware that W.S. was charged with a felony offense of possession of a controlled substance. He said he believes it is very unlikely that W.S. will be able to have his competency restored without the use of these psychoactive medications. However, he believes that if he were able to use these medications, W.S. could be released from the hospital and face his

2

criminal charges sooner. Self stated that these medications are the best "shot" to restore W.S. to competency and that he believes there is a good probability that W.S.'s competency will be restored.

On cross examination, Self testified that he tried to engage W.S. in a discussion regarding these psychoactive medications and their potential side effects without "much luck." Self stated that in those discussions, W.S. became angry, talked over him, and became threatening. In fact, Self stated that he was not able to have a reasonable conversation with W.S. about anything because of W.S.'s anger and insistence that he does not have a mental illness or require medication. He also stated that W.S. exhibits mood changes, threatening verbiage, and becomes angry very easily. Self stated that he believes W.S. has a mental illness because he exhibits delusional beliefs and verbalizes those beliefs to him.

Self admitted that he did not have a detailed health history of W.S. and was unaware of any specific adverse reactions that W.S. may have had to any of the requested medications in the past. However, Self stated that W.S. would be the chief source of that information and he refuses to communicate. Self stated that an adverse reaction to these medications was always possible, but that the chances were "small, small, small." He stated that W.S. would be monitored very closely for any adverse reactions and if he suffered a reaction, Self would employ remedial strategic moves to diminish it, typically by stopping the medication.

According to Self, if W.S. does not take these medications, there would not be much change and he doubts W.S.'s ability to rationally consult with an attorney. Although Self stated that all of these medications could potentially interfere with W.S.'s ability to consult with his attorney, he testified that he is very sensitive to that issue and does not send out patients who are sedated or apathetic as a result of these medications. Self stated that, typically, he finds medication combinations that facilitate, and do not impair, a patient's ability to participate in his defense. According to Self, the requested medications will abate W.S.'s emotional excitement, lability, paranoid delusional beliefs, and his angry and hostile behavior. Self believes that group or other types of therapy are very unlikely to restore W.S.'s competency.

W.S. testified that he does not believe he would benefit from the requested medication because Self falsified statements, reports, and medical records to insinuate that he suffers from a psychotic, delusional, neurotic phobia disorder. He stated that he does not have those symptoms or

3

syndromes. W.S. explained to Self that he does not "experiment" on those types of medications, has never taken "psychotic" medications, and does not have a mental illness. He volunteered to undergo a polygraph examination or x-ray examinations on his brain in order to prove that he does not have any type of disorder. W.S. denied having any confrontations with the physicians or nurses. However, he stated that what causes confrontations is when he attempts to reason with the physicians regarding the reasons he does not wish to take medications. He told Self that he does not have that type of problem, that he does not understand why they are trying to incriminate him with this type of treatment or approach, and that he does not hear voices. According to W.S., Self told him that he suffered from paranoid schizophrenia and became angry and harassing towards W.S. when W.S. explained that he does not have those types of problems. He stated that the physicians were trying to provoke him to anger in order to subject him to these medications. On cross examination, W.S. stated that he went to see a doctor who spoke to him like Self did, "trying to play trickology questions to elicit information" from him.

After the hearing concluded, the trial court granted the application. On September 9, 2008, after considering all the evidence, including the application and the expert testimony, the trial court found that the allegations in the application were true and correct and supported by clear and convincing evidence. The trial court found that W.S. lacked the capacity to make a decision regarding administration of medications and that treatment with the proposed medication was in W.S.'s best interest. The trial court authorized the Department of State Health Services to administer W.S. psychoactive medications, including antidepressants, antipsychotics, mood stabilizers, and anxiolytics/sedatives/hypnotics. This appeal followed.

### INVOLUNTARY ADMINISTRATION OF PSYCHOACTIVE MEDICATIONS

In his sole issue, W.S. argues that the trial court erred in granting the order authorizing administration of psychoactive medication-forensic. More specifically, W.S. contends that the evidence is legally and factually insufficient because the State failed to establish that administration of those medications would significantly further important government interests. The State disagrees.

**Applicable Law**

An individual has a constitutionally protected liberty interest in avoiding the involuntary

4

administration of antipsychotic drugs. *Sell*, 539 U.S. at 178, 123 S. Ct. at 2183; *United States v. Leveck-Amirmokri*, No. EP-04-CR-0961-DB, 2005 WL 1009791, at *3 (W.D. Tex. Mar. 10, 2005). The United States Constitution permits the government to involuntarily administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant "competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly [sic] to further important governmental trial-related interests." *Sell*, 539 U.S. at 179, 123 S. Ct. at 2184. In applying the above standard, a court must (1) find that important governmental interests are at stake, (2) conclude that involuntary medication will significantly further those concomitant state interests, (3) conclude that involuntary medication is necessary to further those state interests, and (4) conclude that administration of the drugs is medically appropriate. *Id.*, 539 U.S. at 180-81, 123 S. Ct. at 2184-85. A court need not consider whether to allow forced medication for purposes of rendering the defendant competent to stand trial if forced medication is warranted for a different purpose, such as the defendant's dangerousness or where refusal to take drugs puts the defendant's health at risk. *Id.*, 539 U.S. at 181-82, 123 S. Ct. at 2185.

**Analysis**

Initially, we note that there is no evidence that W.S. is dangerous to himself or others. The trial court found that W.S. lacks the capacity to make a decision regarding administration of medications, not that he is a danger to himself or others. The trial court also found that treatment with the proposed medication is in W.S.'s best interest, but there is no testimony or finding that his health is at risk if he does not take the proposed medications. Therefore, under *Sell*, we must determine whether the involuntary administration of psychoactive drugs to W.S. in order to render him competent to stand trial is constitutionally permissible. *See id.*, 539 U.S. at 179, 123 S. Ct. at 2184.

Under the first component of the *Sell* standard, we must determine if there are important governmental interests at stake that necessitate the involuntary administration of these drugs to W.S. *See id.*, 539 U.S. at 180, 123 S. Ct. at 2184. The government's interest in bringing to trial an individual accused of a serious crime is important, whether the offense is a serious crime against

persons or property. *See id.*, 539 U.S. at 180, 123 S. Ct. at 2184. Thus, the relevant question becomes what constitutes a "serious crime." *See United States v. Barajas-Torres*, No. CRIM.EP-03-CR-2011KC, 2004 WL 1598914, at \*2 (W.D. Tex. July 1, 2004). When addressing other constitutional issues, the United States Supreme Court and the Texas Supreme Court have defined a "serious offense" as one for which a defendant may be sentenced to imprisonment for more than six months. *See Baldwin v. New York*, 399 U.S. 66, 69, 90 S. Ct. 1886, 1888, 26 L. Ed. 2d 437 (1970) (determining whether defendant had a right to a jury trial); *Ex parte Werblud*, 536 S.W.2d 542, 547 (Tex. 1976) (determining whether relator had a right to a jury trial in a contempt hearing). Here, W.S. was charged with felony possession of a controlled substance. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.115, 481.1151, 481.116, 481.117, 481.118 (Vernon 2003). Although the record does not specify which statute or penalty group is applicable here, the Texas Health and Safety Code provides that the minimum felony grade penalty for possession is a state jail felony. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.115(b), 481.1151(b)(1), 481.116(b). An individual adjudged guilty of a state jail felony shall be punished by confinement in a state jail for any term of not more than two years or less than 180 days. *See* TEX. PENAL CODE ANN. § 12.35(a) (Vernon 2003). Because W.S.'s potential punishment is more than six months of imprisonment, the crime W.S. is charged with is a "serious crime." *See Baldwin*, 399 U.S. at 69, 90 S. Ct. at 1888; *Ex parte Werblud*, 536 S.W.2d at 547. Thus, we conclude that important governmental interests are at stake in involuntarily administering antipsychotic drugs to W.S. in order to render him competent to stand trial. *See Sell*, 539 U.S. at 180, 123 S. Ct. at 2184.

In addition to finding that important governmental interests are at stake, we must determine whether involuntary medication will significantly further those interests. *Sell*, 539 U.S. at 181, 123 S. Ct. at 2184; *Leveck-Amirmokri*, 2005 WL 1009791, at \*4. Specifically, we must conclude that administration of these drugs is substantially likely to render W.S. competent to stand trial and that the drugs are substantially unlikely to have side effects that will interfere significantly with W.S.'s ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. *See Sell*, 539 U.S. at 181, 123 S. Ct. at 2184-85. Self testified at the hearing that it is very unlikely that W.S.'s competency will be restored without psychoactive medications. However, if Self is able to use these medications in treating W.S., there is a good probability that W.S. will be restored to competency.

Self also stated that these medications are W.S.'s "best shot" to regain competency. Thus, the evidence shows that administration of these medications is substantially likely to render W.S. competent to stand trial. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2184.

Self also stated that without administration of these medications, he doubts W.S.'s ability to rationally consult with an attorney. Even though Self admitted that all of the requested medications could potentially interfere with W.S.'s ability to consult with his attorney, he testified that he is very sensitive to that issue and does not send out patients who are sedated or apathetic as a result of using these medications. He stated that he finds medication combinations that facilitate, not impair, a patient's ability to participate. Thus, the evidence shows that administration of these medications is substantially unlikely to have side effects that will interfere with W.S.'s ability to assist counsel in his defense. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2185. Therefore, we conclude that involuntarily administering antipsychotic drugs to W.S. will significantly further important governmental interests. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2184.

Next, we must determine whether involuntary medication is necessary to further those interests. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2185. Specifically, we must determine that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2185. We must also consider less intrusive means for administering the drugs. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2185. Self testified that group or other types of therapy are very unlikely to restore W.S.'s competency. He also testified that he was unable to have any meaningful discussion with W.S. about his mental illness or use of medications. Self stated that during any attempt to discuss W.S.'s mental illness or treatment, W.S. became angry, verbalized grandiose delusional beliefs, talked over him, and became threatening. The evidence shows that any alternative, less intrusive treatments, such as group therapy, will be unlikely to achieve substantially the same results. Thus, we conclude that involuntarily administering antipsychotic drugs to W.S. is necessary to further those concomitant state interests. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2185.

Finally, we must determine whether administration of the drugs is medically appropriate. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2185. More specifically, we must determine that medication is in W.S.'s best medical interest in light of his medical condition. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2185. Self testified that W.S. suffers from psychosis, not otherwise specified. He stated that

the classifications of medications he requested to treat W.S.'s mental illness are in the proper course of treatment and in W.S.'s best interest. The requested medications included an antidepressant, an anxoilytic/sedative/hypnotic, a mood stabilizer, and an antipsychotic. Although Self did not have a detailed health history of W.S. and was unaware of any adverse reactions to medications, he stated that the chances of an adverse reaction were "small, small, small." He testified that W.S. will be monitored very closely for any adverse reactions and that he will take remedial strategic moves to diminish any adverse reaction. According to Self, the requested medications will abate W.S.'s emotional excitement, lability, paranoid delusional beliefs, and his angry and hostile behavior. Again, Self stated that these medications are W.S.'s best "shot" to regain competency. The evidence shows that these medications are in W.S.'s best interest, in the proper course of treatment to abate symptoms of his mental illness, and his best chance of restoring him to competency. Thus, we conclude that involuntarily administering antipsychotic drugs to W.S. is medically appropriate. *See id.*, 539 U.S. at 181, 123 S. Ct. at 2185.

The State has shown that there are important governmental interests at stake, that involuntary medication will significantly further those concomitant state interests, that involuntary medication is necessary to further those state interests, and that administration of the drugs is medically appropriate. *See id.*, 539 U.S. at 180-81, 123 S. Ct. at 2184-85. We conclude that the State satisfied all four elements of the ***Sell*** standard and, therefore, involuntary administration of antipsychotic drugs to W.S. is constitutionally permissible. Accordingly, we overrule W.S.'s sole issue.

<u>DISPOSITION</u>

The judgment of the trial court is ***affirmed***.


  SAM GRIFFITH  

Justice


Opinion delivered August 12, 2009.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*


(PUBLISH)