[Cite as *State v. Demarcia*, 2023-Ohio-4617.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230380 |
| | | TRIAL NO. B-2301110 |
| Plaintiff-Appellee, | : | |
| | : | *O P I N I O N.* |
| vs. | | |
| | : | |
| JAMES DEMARCIA, | : | |
| Defendant-Appellant. | | |
| | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: December 20, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Alex Scott Havlin*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David H. Hoffmann*, Assistant Public Defender, for Defendant-Appellant.

CROUSE, **Presiding Judge.**

{**¶1**}    Defendant-appellant James DeMarcia appeals from the trial court's entry authorizing his treating physician at Summit Behavioral Healthcare ("Summit") to involuntarily administer medication to DeMarcia to restore his competency. In two assignments of error, DeMarcia argues that the trial court erred in granting a petition for the involuntary administration of medication and challenges the trial court's jurisdiction to consider the petition.

## I. Factual and Procedural Background

{**¶2**}    On March 10, 2023, the Hamilton County Grand Jury issued an indictment charging DeMarcia with three counts of felonious assault in violation of R.C. 2903.11(A)(2), having weapons while under a disability in violation of R.C. 2923.13(A)(3), and discharge of a firearm on or near a prohibited premises in violation of R.C. 2923.162(A)(3). The three charges of felonious assault were second-degree felonies, while the latter two charges were both third-degree felonies. Except for the weapons-under-disability charge, all of the charged offenses carried accompanying firearm specifications.

{**¶3**}    In response to a motion filed by DeMarcia's counsel questioning his competency, the trial court appointed the Court Forensic Services to evaluate him. After reviewing the examiner's report, the trial court issued an entry on June 9, 2023, finding that DeMarcia was presently incompetent to stand trial, but that there was a substantial probability he would become competent within one year if provided a course of treatment. The entry ordered DeMarcia to undergo treatment at Summit for a period not to exceed 12 months.

2

{¶4} On June 22, 2023, Dr. Kevin P. Daly, DeMarcia's treating physician at Summit, filed a petition requesting that the court authorize him to involuntarily administer medication to DeMarcia. The petition stated that DeMarcia's primary diagnosis was schizophrenia, that he suffered from paranoid delusions which prohibited him from having reality-based conversations, and that medication was necessary to restore DeMarcia to competency. The petition explained that DeMarcia had strong views against medication and would not voluntarily medicate himself, stating:

> He believes psychiatric medications are poison and has convinced at least one other patient to stop taking their psychiatric medications. He does not believe he has a mental illness and refuses to take any psychiatric medications. He does not understand the purpose of medication and is unable to tolerate conversations about medication or the need for treatment.
>
> Mr. Demarcia [sic] cannot reason about the medications or discuss the risk and benefits of the medications due to his limited insight of his illness and inability to regulate his affect. Regarding his ability to give or withhold informed consent, I believe that he lacks this ability. While he can communicate a choice, he is not able to understand the relevant information. He is not able to understand the nature of his condition or the nature and purpose of the proposed treatment, the possible benefits and risk of the treatment and the lack of alternative approaches to the medication. He is unable to appreciate the situation and its consequences. He cannot reason about treatment.

{¶5} The petition listed 30 medications that Dr. Daly sought authorization to administer to DeMarcia. This list consisted of three mood-stabilizing medications and three medications to combat any resulting side effects of such medication; 14 antipsychotic medications and three medications to combat their potential side effects; four medications to treat DeMarcia's periodic agitation; and three medications to treat insomnia caused by DeMarcia's psychosis.

{¶6} The petition additionally set forth the potential side effects of the various groups of medications. With respect to the mood-stabilizing medications, it stated that one of the requested medications, Depakote, carried a risk of liver damage and could lower a patient's white-blood-cell count. Concerning the antipsychotic medications, the petition explained that "[a]ll antipsychotic medications carry the risk of metabolic syndrome including hypertension, dyslipidemia, weight gain, and reversible diabetes in the case of the atypical agents." It further stated that such medications can also affect the conductivity of the heart and carry a risk of movement disorders. But it asserted that the potential benefits of the medications outweighed any risk, and that DeMarcia would be monitored for any adverse effects. As for the medications used to treat insomnia, the petition stated that a potential side effect of these medications was sedation, and that one of the requested medications had the potential to cause a rare side effect called priapism.

{¶7} The petition further explained that not all the medications would be administered to DeMarcia, stating that "While the list of requested medications is extensive, the plan is not to use all the requested medications. Mr. DeMarcia would be treated with the least amount of medication needed to effectively treat his illness. If

4

the court granted forced medications, my plan would be to start with risperidone and then add a mood stabilizer if indicated."

{¶8} A hearing on the state's petition was held on July 5, 2023. Dr. Daly testified, offering testimony that was in accordance with the information contained in the petition. He told the court that he was a staff psychiatrist at Summit and that he began treating DeMarcia on June 16, 2023. Dr. Daly treated DeMarcia for six days before filing the petition to administer medication involuntarily. He explained that he diagnosed DeMarcia with schizophrenia, that the disease grossly impairs DeMarcia's judgment and behavior, and that DeMarcia has been disruptive to his ward. As an example of this allegedly disruptive behavior, Dr. Daly explained that DeMarcia had convinced another patient that medication is poison, causing that patient to stop taking medication. Dr. Daly stated that he was unable to talk with DeMarcia about medication, as DeMarcia was insistent that he did not have a mental illness and was not interested in discussing his need for medication.

{¶9} Dr. Daly testified that all requested medications were appropriate for schizophrenia and were approved for DeMarcia's size, age, and weight. He stated that, of the requested medications, DeMarcia had previously been administered Geodon, Ativan, Benadryl, and Risperdal. Dr. Daly believed that the requested medications would restore DeMarcia to competency, give him a better grip on reality-based thinking, and allow him to be more cooperative with his doctor and counsel. He stated that DeMarcia could not be restored to competency without these medications and that DeMarcia did not have the capacity to give or withhold informed consent for medical treatment. Dr. Daly explained that group therapy was not beneficial for patients like DeMarcia, who have an altered sense of reality.

5

{¶10} Dr. Daly stated that when administering medication to DeMarcia, he would start with an antipsychotic medication, which has a calming effect and helps people to organize their thoughts. Elaborating on which medications would be administered, Dr. Daly stated, "Well, in psychiatry, there's well-established first-line treatments, second-line treatments. If those don't work, then you go to the third line. And so the first-line treatment for a psychotic disorder would be Risperdal as one of them. And so I'd do that first unless they have a history of a negative reaction to it."

{¶11} Dr. Daly was questioned on cross-examination about DeMarcia's history of migraine headaches. He stated that DeMarcia could receive migraine medication even if taking Risperdal and explained that DeMarcia would be monitored 24 hours a day for any side effects. Dr. Daly was also asked to provide an example of a delusion that DeMarcia had expressed. In response, he related that in March of 2023, DeMarcia had gone to Christ Hospital and told the staff that unknown persons were injecting poison into his feet while he stayed at a homeless shelter. DeMarcia further indicated that he owned the homeless shelter where this occurred.

{¶12} At the close of the hearing, the trial court granted the petition and authorized the involuntary administration of medication to DeMarcia. DeMarcia now appeals from that decision.

## II. Involuntary Administration of Medication

{¶13} In his first assignment of error, DeMarcia contends that the trial court erred in granting the petition for the involuntary administration of medication.

{¶14} Ohio's guidelines for the involuntary administration of medication to a defendant who has been deemed incompetent to stand trial are set forth in R.C. 2945.38(B)(1)(c), which provides that:

If the defendant is found incompetent to stand trial, if the chief clinical officer of the hospital, facility, or agency where the defendant is placed, or the managing officer or director of the institution, facility, or jail, or the person to which the defendant is committed for treatment or continuing evaluation and treatment under division (B)(1)(b) of this section determines that medication is necessary to restore the defendant's competency to stand trial, and if the defendant lacks the capacity to give informed consent or refuses medication, the chief clinical officer of the hospital, facility, or agency where the defendant is placed, or the managing officer or director of the institution, facility, or jail, or the person to which the defendant is committed for treatment or continuing evaluation and treatment may petition the court for authorization for the involuntary administration of medication.

If a petition is filed in accordance with this provision, the trial court is required to hold a hearing on the petition, after which it may "authorize the involuntary administration of medication or may dismiss the petition." *Id.*

{**¶15**} While R.C. 2945.38 authorizes the involuntary administration of medication, it "does not shed light on *whether* a court should order involuntary medication." (Emphasis sic.) *State v. Jefferson*, 1st Dist. Hamilton No. C-200135, 2021-Ohio-2092, ¶ 5. In other words, the statute does not set forth applicable standards to assist a trial court in determining when it is appropriate to take such action. In the absence of such guidance, Ohio courts follow the factors set forth in *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). *Id.*; *State v.*

7

*Ramey*, 10th Dist. Franklin Nos. 19AP-642 and 19AP-643, 2019-Ohio-5087, ¶ 9; *State v. Brewer*, 12th Dist. Clermont No. CA2008-04-040, 2008-Ohio-6193, ¶ 9-11.

{¶16} Under *Sell*, a trial court must make four findings before authorizing the involuntary administration of medication: (1) "that *important* governmental interests are at stake"; (2) "that forced medication will *significantly further* those concomitant state interests"; (3) "that involuntary medication is *necessary* to further those interests"; and (4) "that administering the drugs is *medically appropriate*." (Emphasis sic.) *Sell*, at paragraph two of the syllabus; *see Jefferson* at ¶ 5.

{¶17} DeMarcia concedes that the trial court made the required *Sell* findings before authorizing the involuntary administration of medication, but he argues that the evidence in the record does not support those findings. As we explained in *Jefferson*, "we will reverse only if the trial court's findings are against the manifest weight of the evidence, i.e., not 'supported by some competent, credible evidence.' " *Jefferson* at ¶ 6, quoting *Ramey* at ¶ 11.

### A. Important Government Interest

{¶18} The first *Sell* factor requires the trial court to find that there was an important government interest at stake.

{¶19} "The Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180, 123 S.Ct. 2174, 156 L.Ed.2d 197. The *Sell* court recognized, however, that courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest." *Id.* One special circumstance recognized in *Sell* was where the failure of a defendant to take medication results in lengthy confinement in an institution for the mentally ill. *Id.*

8

While clarifying that "[w]e do not mean to suggest that civil commitment is a substitute for a criminal trial," the court stated that "[t]he potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." *Id.*

{¶20} Here, DeMarcia was charged with five offenses, including three second-degree felonies and two third-degree felonies. If DeMarcia were convicted of all offenses, and if maximum, consecutive sentences were imposed, he would face approximately 30 years of imprisonment, and that calculation excludes any potential application of the Reagan Tokes Law. *See* R.C. 2929.14(A)(2) and (3).

{¶21} While DeMarcia was ultimately indicted for five felony offenses, complaints were initially filed in the Hamilton County Municipal Court concerning the offenses. These complaints, which are part of the record on appeal, alleged that DeMarcia exchanged gunfire with another individual over a public roadway, and that during the exchange, a round of gunfire went through the front passenger door of an occupied vehicle and into the front passenger seat.

{¶22} We have no trouble concluding that, under these circumstances, DeMarcia was accused of serious crimes. The trial court's finding that the government had an important interest at stake in bringing him to trial was supported by competent, credible evidence.

### B. Forced Medication Will Significantly Further the State's Interest

{¶23} The second *Sell* factor requires a trial court to find that involuntary medication would significantly further the state's interests. When considering this factor, the trial court must make two separate inquiries. It must consider whether "administration of the drugs is substantially likely to render the defendant competent

9

to stand trial" and whether "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181, 123 S.Ct. 2174, 156 L.Ed.2d 197; *Jefferson*, 1st Dist. Hamilton No. C-200135, 2021-Ohio-2092, at ¶ 7. The trial court made both findings in support of its determination that involuntary medication will significantly further the state's interests, and competent, credible evidence supported the findings.

**{¶24}** As to the first finding, Dr. Daly testified that the requested medications would restore DeMarcia to competency, give him a better grip on reality-based thinking, and allow him to be more cooperative with his doctor and his counsel. He stated that the benefits of the antipsychotic medications outweighed any potential risks.

**{¶25}** As to the second finding, Dr. Daly testified that DeMarcia would be under 24-hour monitoring for the emergence of any side effects. And as set forth above, the petition explained the potential side effects for each category of the requested medications. DeMarcia contends that neither Dr. Daly's testimony nor his report addressed "the possible impact the antipsychotic medications may have on [his] ability to communicate with his counsel."

**{¶26}** While this issue was not directly addressed, it was certainly indirectly touched on in both Dr. Daly's testimony and the information in the report. The report set forth the potential side effects for the antipsychotic medications, including hypertension, dyslipidemia, weight gain, reversible diabetes, issues with the conductivity of the heart, and movement disorders. It also stated that the benefits of the antipsychotic medications outweighed their risks. While acknowledging these side

effects, Dr. Daly testified that he believed the requested medications would restore DeMarcia to competency and allow him to be more cooperative with his counsel. We can accordingly infer that the antipsychotic medications would not impact DeMarcia's ability to communicate with his counsel, and we hold that the record contained competent, credible evidence to support that finding. *See Jefferson*, 1st Dist. Hamilton No. C-200135, 2021-Ohio-2092, at ¶ 7 (holding that although defendant's psychiatrist did not specifically address whether the requested medications could interfere with his ability to communicate with his counsel, the second *Sell* finding was supported by the record where the psychiatrist testified that defendant had previously taken the sole medication that she intended to administer and had not suffered negative side effects, that the medication would restore the defendant's competency, and that the benefits of the medication outweighed any possible side effects).

{¶27} DeMarcia seemingly takes issue with the fact that, while the trial court included the findings under the second *Sell* factor in its entry authorizing the involuntary administration of medication, it did not make these findings on the record in open court. In support, he cites *State v. McClelland*, 10th Dist. Franklin No. 06AP-1236, 2007-Ohio-841, and *State v. Upshaw*, 166 Ohio App.3d 95, 2006-Ohio-1819, 849 N.E.2d 91 (2d Dist.).

{¶28} In *McClelland*, the trial court failed to find that the administration of medication was substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in *either* its oral pronouncement or its written judgment entry. *McClelland* at ¶ 5. The court stated that "because the court in *Sell* indicated a court must 'find' this sub-factor, we cannot presume regularity in absence of an explicit finding" and that "the trial court was

11

required to specifically find on the record that the medications were substantially unlikely to have side effects that would interfere significantly with appellant's ability to assist with his defense." *Id.* at ¶ 7. The court was concerned that, "without specific findings, a thorough and appropriate appellate review of the trial court's decision would be impossible." *Id.* at ¶ 9.

{¶29} In *Upshaw*, the appellate court found that the trial court failed to make any of the required *Sell* findings. *Upshaw* at ¶ 31. While the court did not differentiate between findings pronounced orally and findings in an entry, it stated that "[i]n the present case, none of the above requirements were followed, nor were the appropriate findings made." *Id.*

{¶30} Unlike *McClelland* and *Upshaw*, the trial court explicitly made the required findings in its written judgment entry, and we are able to conduct a "thorough and appropriate" review of the trial court's decision. *See McClelland* at ¶ 9. It was sufficient for the trial court to make the findings in its written entry, as "a court speaks only through its journal entries, not by oral pronouncements." *State v. Smith*, 1st Dist. Hamilton Nos. C-080712 and C-090505, 2009-Ohio-6932, ¶ 38.

### C. Necessity of Medication to Further the State's Interest

{¶31} The third *Sell* factor requires a trial court to determine whether involuntary medication is necessary to further the state's interests. With respect to this factor, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181, 123 S.Ct. 2174, 156 L.Ed.2d 197.

{¶32} The trial court's finding under this factor was supported by competent, credible evidence. Dr. Daly testified that there was no lesser way to treat DeMarcia's

illness and that DeMarcia could not be restored to competency without the use of medication. He elaborated on this point during cross-examination, stating that group therapy does not benefit patients with an altered sense of reality like DeMarcia, and that for patients with delusional thoughts and schizophrenia, there is not an alternative treatment to medication.

### D. Administration of the Medications is Medically Appropriate

{¶33} The fourth *Sell* factor requires the trial court to find that administration of the medication is medically appropriate. In other words, the court must determine whether the medication is "in the patient's best medical interest in light of his medical condition." *Id.*

{¶34} DeMarcia argues that the trial court's finding under this factor was not supported by the evidence in the record because, although the trial court approved 17 antipsychotic medications, the evidence did not establish that all of the medications were medically appropriate. He contends that the medications "warrant[ed] more than a cursory explanation to justify them as medically appropriate." In support of his argument, DeMarcia relies on *Upshaw*, 166 Ohio App.3d 95, 2006-Ohio-1819, 849 N.E.2d 91, where an involuntary-medication order authorizing the administration of 33 medications was reversed because the record contained no evidence about the side effects of the 33 requested medications or about what medicines or combination thereof would actually be administered.

{¶35} This court considered a nearly identical argument in *Jefferson*, where we stated:

Here, Mr. Jefferson concedes that the evidence shows that Invega was in his best medical interest, but he protests that no evidence demonstrated that the same holds true for the other medications.

In this regard, Mr. Jefferson relies upon *Upshaw*, 166 Ohio App.3d 95, 2006-Ohio-1819, 849 N.E.2d 91, at ¶ 31, where the Second District reversed an involuntary-medication order because the trial court failed to make the necessary *Sell* findings and because the evidence failed to support the trial court's order. Although the trial court in *Upshaw* authorized 33 medications in total, the record contained no evidence about which medications would be used or their side effects. *Id.* Applying *Upshaw*, Mr. Jefferson invites us to reverse because Dr. Doyle did not walk through each of the non-Invega medications or explain their potential side effects. Ultimately, we find *Upshaw* inapposite because Dr. Doyle testified about which medications she planned to use and their possible side effects. Dr. Doyle envisioned utilizing only Invega, to which Mr. Jefferson had previously responded well. And she further explained that she requested approval to use the other medications only in the event that Mr. Jefferson experienced unexpected side effects or encountered other unforeseen problems with Invega. She also offered specific reasons for potentially using the non-antipsychotic medications, including addressing mood swings, insomnia, and agitation. And finally, Dr. Doyle testified that the benefits of all the medications on her list would outweigh any possible side

effects, adding that none of them have any physiological or psychological addiction potential.

*Jefferson*, 1st Dist. Hamilton No. C-200135, 2021-Ohio-2092, at ¶ 9 and 10.

{¶36} The record in the case at bar is much more in line with that in *Jefferson* than in *Upshaw*. Dr. Daly's petition stated that his intention was not to use all the requested medications. Rather, he planned to administer Risperdal, a drug that DeMarcia had previously received, and to add in a mood-stabilizing medication if necessary. The petition explained the side effects for the different categories of medication (mood stabilizers, antipsychotic medications, medications to treat agitation, and medications to treat insomnia). Dr. Daly's testimony further explained the purpose of mood-stabilizing and antipsychotic medications and the ways in which the medications could positively impact DeMarcia. And he stated that the requested medications were appropriate for persons suffering from schizophrenia and for DeMarcia's size, age, and weight.

{¶37} The record contained competent, credible evidence in support of the trial court's finding that administration of the requested medication was medically appropriate. DeMarcia's first assignment of error is accordingly overruled.

### III. Jurisdiction to Entertain Petition

{¶38} In his second assignment of error, DeMarcia argues that the trial court was without subject-matter jurisdiction to consider the petition for the involuntary administration of medication.

{¶39} DeMarcia asserts that requirements concerning competency determinations in R.C. 2945.38 are jurisdictional, and that when the prerequisites of R.C. 2945.38 are not met, the trial court lacks jurisdiction to proceed. He specifically

contends that the prerequisites were not met in this case because the petition for forced medication was filed by Dr. Daly, rather than by the chief medical officer or the director of the facility treating DeMarcia, as is required by R.C. 2945.38(B)(1)(c).

{¶40} DeMarcia's reading of R.C. 2945.38(B)(1)(c) is inaccurate. The statute provides in relevant part that, if a defendant has been found not competent to stand trial:

> [I]f the chief clinical officer of the hospital, facility, or agency where the defendant is placed, or the managing officer or director of the institution, facility, or jail, *or the person to which the defendant is committed for treatment or continuing evaluation and treatment* under division (B)(1)(b) of this section determines that medication is necessary to restore the defendant's competency to stand trial, and if the defendant lacks the capacity to give informed consent or refuses medication, the chief clinical officer of the hospital, facility, or agency where the defendant is placed, or the managing officer or director of the institution, facility, or jail, *or the person to which the defendant is committed for treatment or continuing evaluation and treatment* may petition the court for authorization for the involuntary administration of medication.

(Emphasis added.) R.C. 2945.38(B)(1)(c).

{¶41} The statute plainly and unambiguously provides that "the person to which the defendant is committed for treatment or continuing evaluation and treatment" may petition the court for authorization to involuntarily administer medication. It does not limit the filing of the petition to a chief medical officer or

16

director of the treatment facility. *See State v. Lanier*, 10th Dist. Franklin No. 20AP-480, 2021-Ohio-4194 (holding that the trial court did not err in granting a petition for the involuntary administration of medication that was filed by the defendant's attending psychiatrist).

{¶42} In this case, the record established that Dr. Daly was the person to whom DeMarcia was committed for treatment. Dr. Daly testified that he was a staff psychiatrist at Summit and that he had treated DeMarcia from the date of his admission. As DeMarcia's treating psychiatrist, it was entirely appropriate for Dr. Daly to have filed the petition. We accordingly hold that the trial court was not deprived of jurisdiction to hear the petition because it was filed by a treating psychiatrist, rather than the chief medical officer or director of Summit.

{¶43} The second assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

**ZAYAS** and **BERGERON, JJ.** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.