# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1207-23

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

P.T.,[1]

    Defendant-Respondent.

_____

Submitted October 2, 2024 – Decided October 28, 2024

Before Judges Currier, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-05-0469.

Camelia M. Valdes, Passaic County Prosecutor, attorney for appellant (Lauren P. Haberstroh, Assistant Prosecutor, of counsel and on the brief).

Jennifer N. Sellitti, Public Defender, attorney for respondent (Alexandra K. Roche, Assistant Deputy Public Defender, of counsel and on the brief).

---

[1] We use initials to protect defendant's privacy. Rule 1:38-3(a)(2).

PER CURIAM

The State appeals from the December 19, 2023 order dismissing the indictment against defendant, P.T., after finding he lacked competency. We affirm.

I.

A. The Indictments

When arrested on February 28, 2018, defendant was on pretrial release for 2017 offenses charged under a separate indictment (Indictment I).[2] From the time of his February 2018 arrest, defendant has remained detained. In March 2018, defendant was charged in the indictment underpinning this appeal (Indictment II) with two counts of third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1), one count of third-degree possession of CDS (heroin) with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(3), one count of second-degree possession of CDS (cocaine) with intent to distribute, N.J.S.A. 2C:35-5(a)(1),

---

[2] Indictment I charged three counts of third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1), three counts of third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(3), three counts of third-degree possession of CDS with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-5(a)(1), -7(a); three counts of second-degree possession of CDS with intent to distribute within 500 feet of a public housing facility, park, or building, N.J.S.A. 2C:35-5(a)(1), -7.1(a), and one count of fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2).

(b)(2), and two counts of third-degree possession of CDS with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-5(a), -7(a).

B. The Competency Determinations

Competency questions concerning defendant's fitness to stand trial originated during the January 2019 jury selection for trial on Indictment I when it appeared defendant had difficulty understanding and communicating with counsel. The trial court ordered a competency evaluation, which was conducted on February 4, 2019, by Paul Dasher, Ph.D. Dr. Dasher recommended the case be adjourned to gather more information and rule out malingering and conducted another evaluation on February 14, 2019. His report opined that "defendant [was] not competent[] as there [was] an underlying psychiatric disorder that significantly impair[ed] his ability to consult with counsel and assist in his own defense." Dr. Dasher stated that with "proper medication and treatment," there was a "reasonable expectation" that defendant could regain competence. Defendant refused to take any medication.

The trial court thereafter ordered another competency evaluation to further "determine defendant's capacity to understand the proceedings against him and to assist in his own defense."

Tarmeen Sahni, Ph.D., conducted the next evaluation in April 2019 and issued a report in May 2019. Dr. Sahni noted defendant, without medication, was able to engage in "coherent discussion" and express a "rational understanding . . . [of] the legal system." The doctor diagnosed defendant with delusional disorder, but found him competent to stand trial and "oriented to person, place, time, and situation," understanding the roles of the judge, prosecutor, defense attorney, and jury. Finding defendant also understood his right to testify and the concept of plea bargaining, Dr. Sahni opined that any confusion regarding the trial process was from lack of experience. Dr. Sahni found defendant presented "low risk of dangerousness to [him]self [and] others," but explained that return to the community and his "homeless status" might cause defendant to deteriorate without supervision. After a hearing in July 2019, the trial court found defendant fit to stand trial.

Trial on Indictment I commenced soon after, and a jury found defendant guilty on nine of thirteen counts on September 5, 2019. See State v. P.T., No. A-1602-19 (App. Div. Mar. 8, 2023) (slip op. 1-4). The court ordered another competency evaluation prior to sentencing, which was again conducted by Dr. Dasher in October 2019, who determined defendant was competent to proceed having demonstrated his "understand[ing of] basic legal concepts." Although

4

defendant was "not accessing any mental health treatment . . . [and was] not on any psychotropic medication," he "still ha[d] the requisite adjudicative competence."

Thereafter, on Indictment I, the court, after merger, imposed an aggregate sentence of ten years' imprisonment with five years' parole ineligibility. We affirmed the conviction but remanded for resentencing on a merger error. See P.T., slip op. at 1-4.

As Indictment II proceeded before a new trial judge, competency questions again emerged, and the judge ordered a new evaluation. Heidi Camerlengo, Ed.D., evaluated defendant on two occasions—once in March 2020 and a second time in August 2021—and rendered a report in October 2021 finding he lacked competency to stand trial.[3] Dr. Camerlengo found defendant did not understand his present legal situation, specifically that he was in a criminal court charged with criminal offenses, was unable to orient himself to the facts of the offense due to his delusional thought process, and was unable to participate in presenting his defense.

---

[3] The COVID-19 pandemic and the applicable health restrictions in place at Ann Klein Forensic Center (AKFC) and in state prison caused a delay in competency evaluations and proceedings and a large interval of time elapsed between Dr. Camerlengo's evaluations and her report.

A-1207-23

Dr. Camerlengo further opined defendant "[did] not appear capable of communicating relevant information to his attorney" or capable of "utilizing appropriate decision-making skills related to his legal issues due to his delusional thought process." Although defendant "might benefit from a trial of antipsychotic medication to address his delusional thought process," Dr. Camerlengo noted he "ha[d] consistently refused to accept psychotropic medication, and some practitioners question[ed] whether it would be effective in addressing his delusions."

On November 4, 2021, defendant's prison physician approved the involuntary administration of antipsychotic medication to defendant which continued until March 2023. In May 2022, Dr. Camerlengo again evaluated defendant for competency, observing defendant's "presentation during this evaluation appear[ed] to be related to his mental illness that seem[ed] to have only partially responded to treatment." The corresponding report detailed defendant's "fixed delusions" despite his "psychotropic medication," noting the medication was changed at one time when defendant had negative physical side effects. Dr. Camerlengo could not determine defendant's fitness to stand trial because of "his unwillingness to cooperate . . . which [was] likely due to mental incompetence" and recommended "inpatient psychiatric hospitalization . . . to

6

facilitate stabilization" and ultimately determine whether defendant could be restored to competence.

Defendant was transferred to AKFC in April 2023 for treatment and further evaluation. Douglas Smith, M.D., evaluated defendant and issued a report in May 2023, finding defendant incompetent to stand trial but also deeming it "substantially probable" that treatment with antipsychotic medication would restore him to competence "in the foreseeable future." As to dangerousness, the report noted that there were no "behavioral issues" since defendant's arrival at AKFC.

Pursuant to the court's May 2023 order, Dr. Smith re-evaluated defendant and issued a report in September 2023 again concluding defendant was not fit to proceed to trial. Finding defendant still exhibited delusions interfering with his ability to participate in his defense, Dr. Smith again opined that defendant presented no behavioral issues and concluded "[i]t is substantially probable that, with treatment with antipsychotic medication, [defendant] would attain fitness in the foreseeable future."

The court then conducted a competency hearing in September 2023, with Dr. Smith testifying as to his findings. Dr. Smith recommended medication as a significant component for restoration, but explained that defendant refused to

7

cooperate. AKFC did not administer involuntary medication because defendant did not meet the facility's criteria in that defendant did not pose a foreseeable risk of danger to himself or others. Consistent with his September 2023 report, Dr. Smith explained defendant did not appreciate the nature or gravity of his legal situation due to his delusional condition.

Dr. Smith agreed that it is generally accepted that those with delusional disorders can be responsive to antipsychotic medication, but acknowledged potential side effects ranging in severity can result from antipsychotic medication, including sedation that might interfere with the ability to communicate and cause difficulty remaining alert. The doctor opined that medication does not typically interfere with memory absent a high dosage and the process at AKFC is to monitor the dosage of medication, with dosage adjusted or changed altogether upon negative side effects. Nonetheless, Dr. Smith indicated that there's always a risk of side effects, and it was not possible to eliminate them entirely.

At the conclusion of the competency hearing, the judge inquired about the criteria for ordering involuntary medication, and defense counsel identified the four considerations set forth in Sell v. United States, 539 U.S. 166, 180-82 (2003), for court-ordered forcible medication. Defense counsel then indicated

A-1207-23

she would be filing a motion to dismiss Indictment II and signaled that defendant was eligible for parole on his sentence on Indictment I. Both counsel and the court concurred that should the court dismiss Indictment II, AKFC could initiate involuntary commitment if justified. No order was issued for a new evaluation.

C. Motion to Dismiss Indictment II

Defendant filed a motion to dismiss Indictment II under N.J.S.A. 2C:4-6(c), which was argued in December 2023. The court asked that counsel address the issue of involuntary medication under the factors set forth in Sell, 539 U.S. at 180-82, further clarified in State v. R.G., 460 N.J. Super. 416, 428-31 (App. Div. 2019).

Defense counsel asserted that the State had not moved for involuntary medication of defendant and defendant did not meet the involuntary medication standard. Counsel argued: the governmental interest in prosecuting defendant was substantially diminished by the length of time he had been incarcerated pretrial; involuntary medication could have a negative impact on defendant's functioning at trial; involuntary medication is not necessary or medically appropriate; and AKFC had determined defendant did not meet the medical criteria to be medicated against his will.

A-1207-23

In addressing dismissal under the N.J.S.A. 2C:4-6(c) factors, defense counsel claimed: it was unlikely that defendant, incompetent since October 2019, would regain competence in the near future; defendant did not regain competency during the time he was involuntarily medicated starting in 2021 and until March 2023; defendant had been institutionalized for a lengthy period of time (almost six years); the charges, although serious, were non-violent, and the most serious second-degree charges related to the alleged cocaine found on defendant would likely be dismissed as the lab results were negative for that substance; the prejudice to the State resulting from further delay in a drug case would be lessened by the ability to refresh the memories of largely police witnesses with reports; defendant had been, by contrast, greatly prejudiced by his years of pretrial detention impacting his constitutional right to a speedy trial; and the public interest in prosecuting the case is lessened as the lengthy pretrial incarceration has accomplished any necessary deterrent effect.

The State contended the statutory presumption against dismissal and the circumstances of the case favored holding the charges in abeyance. Specifically, the State claimed: involuntary medication could help to restore competency; the offense of distributing CDS is very serious and offenders must be held accountable; the State's plea offer was irrelevant as the charges could be held in

A-1207-23

abeyance as long as that delay did not exceed the maximum sentencing term; there would be no prejudice to the State by holding the charges in abeyance; and any prejudice to defendant was and would be lessened by his simultaneously serving another sentence.

The State conceded it had not moved for involuntary medication of defendant, but argued in favor of such an order, contending there is a strong governmental interest in prosecuting and deterring drug offenders; any side effects from involuntary medication such as sedation could be monitored and managed; and restoring defendant to competency would be in his best interest.

The court then questioned defendant directly, inquiring generally about the proceedings and his condition. Defendant's responses reflected his lack of understanding of his situation including his belief that he was a "high court judge" who "went to school to be a judge" at Seton Hall University and "these cases were resolved already."

Assessing dismissal versus abeyance, the court first acknowledged the statutory presumption that it could hold charges in abeyance unless it finds "continuation . . . would constitute a constitutionally significant injury to . . . defendant attributable to undue delay in being brought to trial." N.J.S.A. 2C:4-6(c). The court found the first four factors under N.J.S.A. 2C:4-6(c)

11

favored dismissal. First, the court found it could not "determine with any definitiveness that [defendant] will return to competency" and noted defendant was "found incompetent more than he has been found competent" and defendant now appeared incompetent. The court next acknowledged defendant has been "sitting in jail . . . since 2018" and "[t]hat's a long time to be incarcerated."

Further, the court recognized the seriousness of the offenses, but noted if defendant had accepted the State's plea offer of a concurrent sentence to that which he is serving on Indictment I, he would be eligible for parole. Considering the next factors, the court accepted there would be no adverse impact on the prosecution if there were further delay, but found there might be an adverse effect on defendant if witnesses were to be called by defendant. The court explained that defendant may not have "witnesses . . . that would testify for him" and "if there are witnesses . . . they don't have . . . reports to rely upon."

The court declined to order involuntary medication, finding "even if [defendant] were to receive involuntary medication, there's no guarantee [it] would] bring [defendant] up to speed." Recognizing that AKFC found defendant did not meet the internal criteria for involuntary medication because he did not pose a danger to himself or others, the court was concerned about imposing involuntary medication. Although clearly identifying the public interest in

prosecuting "selling drugs," the court questioned whether society has that same interest in "punishing someone" who is incompetent. Further, the court found defendant had already been "reasonably punished for the crime," observing again that the case might have been resolved by plea agreement favorably to defendant if he had been competent enough to consider the State's plea offer.

The court found defendant incompetent and dismissed the indictment, issuing an order of dismissal on December 19, 2023. The court further ordered defendant remain at AKFC until his next appearance in January 2024 and ordered that AKFC provide the court with a treatment plan for defendant prior to that appearance. The State appealed.

II.

The State raises the following arguments on appeal:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION BY DISMISSING INDICTMENT 18-05-0469-I BECAUSE DEFENDANT DID NOT OVERCOME THE PRESUMPTION IN FAVOR OF HOLDING PROCEEDINGS IN ABEYANCE.

POINT II

THE TRIAL COURT COMMITTED CLEAR ERROR BY REFUSING TO INVOLUNTARILY MEDICATE DEFENDANT WHERE THE STATE SATISFIED ALL FACTORS UNDER SELL V. UNITED STATES

13

BY CLEAR AND CONVINCING EVIDENCE (539 U.S. 166 (2003)).

As to Point I, the State asserts the court abused its discretion by finding defendant was unlikely to regain competency because defendant was deemed competent in 2019, and over the next four years consistently displayed at least some understanding of the court process. The State further contends the court did not consider defendant was serving a ten-year sentence under Indictment I and gave improper weight to factor four in favor of dismissal by improperly focusing on the plea offer of a concurrent sentence. In addition, the State asserted its strong public interest in prosecuting CDS distribution offenses and the court erred in finding defendant had been "reasonably punished" in light of his history of CDS-related offenses.

As to Point II, the State contends the court erred in refusing to order involuntary medication as the State established all of the <u>Sell</u> factors by clear and convincing evidence.

Defendant counters that the court appropriately considered the arguments under each N.J.S.A. 2C:4-6(c) factor and reasonably exercised its discretion in dismissing the indictment, appropriately finding a constitutionally significant injury to defendant by the continued prosecution despite defendant's incompetence. That defendant was serving a sentence on Indictment I, and

COVID-19 concerns delayed defendant's evaluations does not minimize the constitutional and speedy trial concerns in defendant's case.

Defendant further argues that although the State did not move for involuntary medication, the court properly analyzed and rejected forcibly medicating defendant under the applicable legal standard.

## III.

We review "[a] trial court's decision denying defendant's motion to dismiss [an] indictment . . . for abuse of discretion." State v. Saavedra, 222 N.J. 39, 55 (2015). Such "discretionary power will not be disturbed on appeal 'unless it has been clearly abused.'" Id. at 55-56 (quoting State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994)). We will intervene to correct an abuse of discretion only when the "decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)).

A defendant who "lacks capacity to understand the proceedings against him or to assist in his own defense" cannot be convicted of an offense "so long as such incapacity endures." N.J.S.A. 2C:4-4(a). Competency determinations are the sole province of the court, and upon a finding of a defendant's

A-1207-23

incompetence, when a defendant "has not regained fitness to proceed within three months" following the court's initial determination of incompetency, the court must consider whether to dismiss the charges with prejudice or hold further proceedings in abeyance.  N.J.S.A. 2C:4-6(c).

N.J.S.A. 2C: 4-6(c) further provides a presumption that charges be held in abeyance upon a finding of continued incompetency, which "can be overcome" if the court, utilizing statutorily enumerated factors, finds further delay "would constitute a constitutionally significant injury to the defendant attributable to undue delay in being brought to trial."  The factors to be weighed include:

> [1] the defendant's prospects for regaining competency; [2] the period of time during which the defendant has remained incompetent; [3] the nature and extent of the defendant's institutionalization; [4] the nature and gravity of the crimes charged; [5] the effects of delay on the prosecution; [6] the effects of delay on the defendant, including any likelihood of prejudice to the defendant in the trial arising out of the delay; and [7] the public interest in prosecuting the charges.
>
> [N.J.S.A. 2C:4-6(c).]

Dismissal is appropriate "when it is determined that an adequate period of time has elapsed during which the defendant has been institutionalized and has remained unfit to be tried."  State v. Gaffey, 92 N.J. 374, 389 (1983).  "[T]he

16

real or likely prejudice to the rights of the defendant that can actually be shown or reasonably be inferred from the delay in bringing the matter to trial" aids courts in determining the adequacy of time.  Ibid.  This court has further recognized that

> [w]hile elemental fairness and due process considerations are applicable to avoid constitutionally significant injury attributable to undue delay, the validity of claims relating to speedy trial should be made on a case-by-case basis in terms of the prejudice to defendant's rights that can actually be shown or reasonably be inferred from the delay.
>
> [State v. Moya, 329 N.J. Super. 499, 514 (App. Div. 2000).]

A court's consideration "requires more than mere reliance upon the length of time elapsed."  Ibid.

Here we discern no basis for disturbing the court's order dismissing the indictment.  Recognizing the presumption against dismissal, the court properly considered the N.J.S.A. 2C:4-6(c) factors and found that it could not determine that defendant was likely to regain competence, and further delay would exact enduring constitutionally significant injury to defendant.  That conclusion was grounded in the record.

A-1207-23

The court observed that, despite being found competent early in the proceedings, defendant currently appeared to be incompetent, had been found incompetent more times than competent, and remained incompetent since 2019. It found that the nearly six years defendant was incarcerated pretrial and the nature and extent of his institutionalization, during which defendant was both unmedicated and medicated in both prison and hospital settings, supported dismissal.

The court analyzed the nature and gravity of the crimes charged, recognizing the seriousness of drug distribution. We find no error in the court's noting the State's plea offer to recommend a sentence concurrent to his sentence on Indictment I would likely have already rendered defendant parole eligible.

The court also considered the diminished prejudice to the State by further delay noting memories could be refreshed by police reports created at the time of the drug offenses, but found defendant faced greater potential prejudice with the passage of time because any witnesses he may have decided to call to testify would likely be unable to rely on similar reports.

Finally, the court recognized there is "absolutely" a public interest in prosecuting drug distribution charges, but reasonably considered the circumstances of defendant's situation, specifically his lengthy incarceration and

A-1207-23

consistent incompetence. Thus, we will not disturb the court's determination as the court recognized each statutory factor and anchored its decision in the record.

IV.

We turn to the State's contention that the court erred in not entering an order for involuntary medication. We recognize the State made no formal application for forced medication, and the trial court raised the issue. We nevertheless determine that the State received ample notice of the issue at the competency hearing and argued in support of an involuntary medication order, after which the court properly addressed the applicable legal standards and rooted its factual determinations in the record.

"In light of the constitutional rights at stake on a motion to involuntarily medicate a defendant to restore competency," the court's "legal determinations on a Sell application are reviewed de novo while its factual findings are reviewed for clear error" under Rule 2:10-2. State v. J.H.P., 478 N.J. Super. 262, 278 (App. Div. 2024). In assessing clear error, we may "not reverse the findings of the [motion] court simply because [we] would have weighed the evidence differently." Id. at 276 (alteration in original) (quoting United States v. Coy, 991 F.3d 924, 929 (8th Cir. 2021)).

A-1207-23

In Sell, the Supreme Court set forth a four-part test in evaluating for involuntary medication of a defendant who has not yet been convicted of a crime, holding:

> [T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important government trial-related interests.
>
> [539 U.S. at 179.]

Specifically, to satisfy the standard in Sell, a court must find by clear and convincing evidence that 1) important governmental interests are at stake; 2) involuntary medication will significantly further those interests; 3) involuntary medication is necessary to further those interests; and 4) administration of the drugs is medically appropriate, or in the patient's best interest in light of his medical condition. Id. at 180-82; see also State v. R.G., 460 N.J. Super. at 429 n.5.

The governmental interest is strong when the prosecution involves "a serious crime against the person or a serious crime against property," and courts must also consider special circumstances that "may lessen the importance of

[the] interest," such as the potential for future confinement and whether the defendant has already been confined for a significant amount of time. Sell, 539 U.S. at 180. Also, "lengthy confinement in an institution for the mentally ill . . . would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." Ibid. We further narrowed the scope of this consideration in R.G., 460 N.J. Super. at 430, "agree[ing] . . . that Sell's first factor is not informed by defendant's maximum [sentencing] exposure but by defendant's probable sentence if convicted."

Here, the trial court properly applied the legal standards to the record. Specifically, the court found that prosecuting drug distribution is an important governmental interest, but also recognized that defendant was not charged with violent crimes. We perceive no error in the court's finding that the State's interest in prosecution diminishes when considering defendant's incarceration since February 2018, through a worldwide pandemic, which certainly exacted a deterrent impact. We note that defendant's likely sentence if convicted would be reduced, given the apparently undisputed laboratory testing removing any potential second-degree exposure.

Further, as the trial court stated, AKFC professionals did not determine defendant to be dangerous to himself or others, and although applying its own

internal clinical standard, found forcible medication unwarranted in defendant's case. The court did not err in determining these findings of non-dangerousness diluted the governmental interest in prosecution.

We also recognize the record did not support, by clear and convincing evidence, that involuntary medication was necessary to further the interests in continued prosecution. Under <u>Sell</u>, the "administration of the drugs [must be] substantially likely to render the defendant competent to stand trial," and "substantially unlikely to have side effects that will interfere significantly with defendant's ability to assist counsel in conducting a trial defense . . . ." <u>Sell</u>, 539 U.S. at 181.

Here, the court addressed Dr. Smith's opinion that involuntary medication had a "substantial probability" of restoring defendant, weighing that opinion in conjunction with the record. We discern no error in the court's recognizing that defendant had been involuntarily medicated for a substantial period of time between 2021 and 2023, yet his evaluations during that period revealed defendant remained delusional, only "partially responded to treatment," and had an unwillingness to cooperate likely due to his mental illness. Further, the court noted the testimony that experimenting with medication could cause side effects like sedation that might be detrimental to defendant and his ability to engage in

the trial process. We note that the record also reflects that defendant was not medicated during his small window of competence in 2019.

As the record lacked clear and convincing evidence that forced medication would restore defendant without medical side effects and advance the government interest, the court reasonably declined to enter such an order. The Supreme Court in Sell warned its standard would permit involuntary administration of drugs for trial competence purposes, but "[these] instances may be rare." Id. at 180. We are satisfied defendant's is not one of those unique cases.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1207-23