# COURT OF APPEALS
# DECISION
# DATED AND FILED

# October 31, 2024

Samuel A. Christensen
Clerk of Court of Appeals

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2024AP591-CR**
**2024AP592-CR**
**2024AP593-CR**
**2024AP594-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2023CM243
2023CM244
2023CM355
2023CM360

## IN COURT OF APPEALS
## DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

M. M. K.,

DEFENDANT-APPELLANT.

APPEALS from orders of the circuit court for Portage County: LOUIS J. MOLEPSKE, JR., Judge. *Affirmed*.

APPEALS from orders of the circuit court for Portage County: MICHAEL D. ZELL, Judge. *Reversed*.

¶1     GRAHAM, J.[1]  M.M.K., who was charged with five misdemeanor counts of violating a harassment injunction, was determined to be incompetent to proceed to trial.  In each of M.M.K.'s criminal cases, the circuit court entered an order committing her to the state department of health services for treatment to competency, and a separate order authorizing the involuntary administration of medication.  M.M.K. challenges both sets of orders on appeal.[2]  I affirm the orders that found M.M.K. incompetent and committed her for treatment, and I reverse the involuntary medication orders.[3]

## BACKGROUND

¶2     The State filed four criminal complaints against M.M.K., all alleging that she violated a harassment injunction over a several-month period in 2023.  *See* WIS. STAT. § 813.125(4).  The injunction prohibited M.M.K. from contacting her then-husband or posting about him or their child on social media.  The complaints collectively alleged that M.M.K. violated the injunction by sending emails to her husband, which claimed he was abusive, and by making social media posts that mentioned her husband, some of which claimed that he was mentally ill, unstable, and withholding their child from M.M.K.

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version.

[2]  These appeals were consolidated for briefing and disposition by an order dated March 28, 2024.  *See* WIS. STAT. RULE 809.10(3).

[3]  M.M.K. has since been discharged from her commitment and is no longer subject to the involuntary medication order.  The parties agree that this appeal should be decided on the merits, even if any of the issues on appeal are arguably moot.

¶3 During the pretrial proceedings, questions were raised about M.M.K.'s competency. Under WIS. STAT. § 971.13(1), "[n]o person who lacks substantial mental capacity to understand the proceedings or assist in his or her own defense may be tried, convicted, or sentenced for the commission of an offense so long as the incapacity endures." "[W]henever there is a reason to doubt a defendant's competency to proceed," a circuit court "shall" order competency proceedings after finding probable cause that the defendant committed the charged offense. WIS. STAT. § 971.14(1r)(a), (c). If the court determines that a defendant is incompetent but may be restored to competency through treatment, the court "shall suspend the [criminal] proceedings and commit the defendant to the custody of the department [of health services] for treatment," and the department has a limited window of time to attempt to restore the defendant's competency. § 971.14(5)(a)1.[4]

¶4 Separately, and subject to legal standards that are discussed at length below, the department may file a motion asking the court to enter an order that allows the department to involuntarily administer medication to restore the defendant to competency. *See Sell v. United States*, 539 U.S. 166 (2003); WIS. STAT. § 971.14(5)(am).

¶5 Here, the circuit court ordered a competency examination, and the examining evaluator indicated that M.M.K. may have a delusional disorder.

---

[4] Specifically, WIS. STAT. § 971.14(5)(a)1. provides that the treatment period is "not to exceed 12 months, or the maximum sentence specified for the most serious offense with which the defendant is charged, whichever is less." Here, the maximum sentence for each of the charges was nine months, WIS. STAT. § 813.125(7), and I refer to this nine-month window as the "statutory time frame" or "statutory period."

3

However, the evaluator was unable to offer an opinion to a reasonable degree of professional certainty about M.M.K.'s capacity to understand court proceedings or her ability to assist in her defense. The court ordered an inpatient examination, which took place at Mendota Mental Health Institute ("Mendota"). *See* Wis. Stat. § 971.14(2). Danielle Calas, a licensed clinical psychologist with a doctorate in clinical psychology, examined M.M.K. and diagnosed her with "[u]nspecified schizophrenia spectrum and other psychotic disorder." Dr. Calas opined that M.M.K. lacked the capacity to understand the criminal proceedings against her and assist in her defense, but was likely to be restored to competency within the statutory period. Dr. Calas recommended inpatient treatment to restore M.M.K. to competency, and further recommended that the department pursue an order for involuntary administration of medication and treatment.

¶6       The county department of health services filed a separate motion seeking an order that would allow for the involuntary administration of medication in order to treat M.M.K. to competency. Along with the motion, the department filed a report and proposed treatment plan that had been authored by Dr. Candace Cohen, a board certified psychiatrist who is employed by Mendota.

¶7       The circuit court addressed the issues regarding competency and involuntary medication during two separate hearings, both contested. *See* Wis. Stat. § 971.14(4). As discussed at greater length below, during the first hearing, which I refer to as the "commitment hearing," the court determined that M.M.K. was not competent to stand trial, and it committed her to the department's custody for treatment. And then during the second hearing, which I refer to as the "involuntary medication hearing," the court authorized the involuntary administration of medication.

4

¶8      The commitment hearing took place on March 12, 2024, with the Honorable Louis J. Molepske presiding.  Dr. Calas was the only witness, and she testified that she based her opinions on her interview and encounters with M.M.K., staff observation and documentation, and other records.  Dr. Calas testified that M.M.K. "understands the legal proceedings," but that she lacked insight into what was real and what was not, and her "perception of the events that led to her charges" precluded her from having the "ability to make an independent autonomous decision or apply the facts" to her criminal cases.  Dr. Calas opined that, in her opinion, M.M.K. could be restored to competency through treatment, and that the likelihood of treatment being effective would be higher if it included the administration of psychotropic medication.

¶9      The circuit court issued an order finding M.M.K. incompetent and committing her to the department's custody for treatment.  It found that M.M.K. was intelligent and understood the court proceedings, but that she lacked the capacity to assist in her defense.  As discussed in greater detail below, the court found that Dr. Calas's report and testimony showed "by the clear, satisfactory and convincing evidence that [M.M.K.] is not competent to proceed at this time," but that M.M.K. would regain competency "within the statutory time frame."

¶10     The involuntary medication hearing took place on March 26, 2024, with the Honorable Michael D. Zell presiding.  At that hearing, the parties agreed that the applicable legal standards are set forth in *Sell*, 539 U.S. 166.  There, the United States Supreme Court emphasized that criminal defendants have "a 'significant' [and] constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'"  *Id.* at 178 (citation omitted). The Court further determined that, before forcibly medicating an accused person

5

to competency to stand trial, the State must prove by clear and convincing evidence that: (1) the State has an important interest in proceeding to trial; (2) involuntary medication will significantly further the State's interest; (3) involuntary medication is necessary to further the State's interest; and (4) involuntary medication is medically appropriate. *Id.* at 180-81. In addition to these *Sell* factors, Wisconsin statutes also require the State to prove that the accused person is not competent to refuse medication. WIS. STAT. § 971.14(3)(dm) and (4)(b).

¶11    During the involuntary medication hearing in M.M.K.'s case, the parties disputed whether the State met its burden on the first *Sell* factor. As discussed at greater length below, to satisfy that factor, the State must show an interest in "bringing to trial an individual accused of a serious crime," and the parties disputed whether the crimes that M.M.K. allegedly committed were sufficiently "serious" to satisfy this factor. *Sell*, 539 U.S. at 180. The parties also disputed whether the State met its burden to prove the remaining *Sell* factors.

¶12    At the end of the involuntary medication hearing, the circuit court determined that "the charges are serious in the sense that is contemplated by *Sell* and other cases interpreting that language." The court further determined that "the involuntary administration of medication will significantly further important government interests because it is likely to render [M.M.K.] competent to stand trial, and is substantially unlikely to have side effects that undermine the fairness of the trial by interfering with [her] ability to assist counsel." Finally, the court determined that "the involuntary administration of medication or treatment is necessary because alternative, less intrusive treatments are unlikely to achieve

6

substantially the same results." The circuit court entered an involuntary medication order.

¶13 M.M.K. appealed the commitment order and the involuntary medication order, and we granted M.M.K.'s motion for a stay of the involuntary medication order pending disposition of this appeal.[5]

## DISCUSSION

¶14 On appeal, M.M.K. challenges the competency determination that the circuit court made at the commitment hearing,[6] and she further challenges the involuntary medication order that the court entered following the involuntary medication hearing. I address these challenges in turn.

## I

¶15 Competency is a "judicial inquiry, not a medical determination," and a court's task at a contested commitment hearing is to determine whether the evidence shows that "the defendant can understand the proceedings and assist

---

[5] After M.M.K. filed her notice of appeal, she was again evaluated at Mendota, and the evaluator opined, among other things, that it was unlikely that she would be "restored to adjudicative competence within the statutory period." The evaluator further opined that M.M.K. had not presented as a danger to herself or others, nor did she have a history of dangerousness—as such, the evaluator did not recommend further action, which could have included evaluation for potential commitment pursuant to WIS. STAT. § 51.20. Following a May 10, 2024 hearing, the circuit court discharged M.M.K. from commitment and dismissed the criminal matters against her without prejudice. As mentioned, neither party argues that the appeal should be dismissed on mootness grounds.

[6] As discussed, during the commitment hearing, the circuit court also determined that M.M.K. could be restored to competency with treatment during the statutory period. M.M.K. does not challenge this determination on appeal, and I discuss it no further.

counsel 'with a reasonable degree of rational understanding.'" *State v. Byrge*, 2000 WI 101, ¶31, 237 Wis. 2d 197, 614 N.W.2d 477 (citation omitted). "A competency determination is functionally a factual finding," and therefore, my review of the circuit court's competency determination is for erroneous exercise of discretion. *State v. Smith*, 2016 WI 23, ¶26, 367 Wis. 2d 483, 878 N.W.2d 135.

¶16 Here, as noted, the circuit court found that M.M.K. was intelligent and understood court proceedings, but that she lacked the capacity to assist in her defense. More specifically the court found that M.M.K. understood fundamental aspects of court proceedings such as the roles of the judge, the prosecutor, and the defense attorney, and she could articulate the meaning of different types of pleas. However, the court credited the testimony that M.M.K.'s untreated schizophrenia and other psychiatric disorders and the delusions that she experienced as a result of those disorders "clouds her ability to fully understand [certain] aspect[s] of assisting in her own defense."

¶17 This determination finds support in the evidence introduced at the commitment hearing. Specifically, Dr. Calas testified that it was difficult to talk to M.M.K. about the criminal cases because her delusions resulted in her having "fixed false beliefs that are so tightly held that she's traumatized by them." Dr. Callas further testified that, "when you try to explain to her the truth, she becomes very intense and very upset," and "very difficult to redirect." One of M.M.K.'s false beliefs was that she and her family were being trafficked, and another was that she was the daughter of the British monarch Queen Elizabeth and the Russian president Vladimir Putin. M.M.K. believed that she was being persecuted, including by the filing of the criminal charges in these cases, as a result of her lineage. The court noted that, to adequately prepare for trial and

effectively represent M.M.K. during trial, her attorney would need to gather factual information about the charged offenses, and that M.M.K.'s delusions would make it difficult to gather that information. As the court explained:

> [W]hen you [defense counsel] lean over, for example, during trial, and the State's going into some area of the facts, hypothetically, and you may ask [M.M.K.], tell me about that because I don't recall seeing that in the police report, and she starts talking about her father, President Putin, and her mother, Queen Elizabeth, that's not going to assist in her defense.
>
> You're going to be needing information from her in order to make objections, present her defense and further assist in that with you as the practitioner. That's the area that is a concern of the Court, and that's what the doctors testified to.

¶18 M.M.K. does not challenge that the circuit court had discretion to credit Dr. Calas's testimony on these points. Nor does she dispute that Dr. Calas's testimony was sufficient to support a determination that M.M.K. lacked the capacity to assist in her defense. The record makes clear that the circuit court relied on Dr. Calas's testimony when it made its competency determination, and that the court's decision was a reasoned application of the law to the facts. I therefore conclude that the circuit court properly exercised its discretion.

¶19 In arguing to the contrary, M.M.K. contends that the circuit court erroneously relied on the fact that a motion for involuntary medication had been filed when it made its competency determination. Generally speaking, I agree that, had the court based its determination that M.M.K. was incompetent on the mere filing of an involuntary medication request, that might constitute an erroneous exercise of discretion. However, for reasons I now explain, I conclude that the circuit court did not do so here.

9

¶20 To support her assertions, M.M.K. points to portions of the commitment hearing transcript in which the circuit court commented on the pending motion for involuntary medication. At one point during its ruling, the court acknowledged that, although it would be "premature" to make a decision on the involuntary medication request, Dr. Cohen's report stated that M.M.K. "requires involuntary medication in order to gain competency." The court stated that the fact that "a medical doctor" authorized that request "is indicating that there is something significant going on for [M.M.K.]"[7] Then, after relying on Dr. Calas's testimony to determine that M.M.K. would not be able to assist in her own defense, the court stated:

> [T]he Court is finding that there is a substantial competency issue such that the doctors have already requested that she be involuntarily treated, which of course we have not heard Dr. Cohen yet, but to file this motion under the statute, you have to have a legal basis under [WIS. STAT. §] 971.14(5) that she is not competent, cannot rationalize the benefits, the pros/cons of taking medication, pros/cons of being treated such that it's clinically affecting her stability and … mental health at this stage in this criminal case[.] … [T]here is … an inference the Court can take from that that the—this one examiner, Dr. Calas, the psychologist, and the medical doctor, … Dr. Cohen's request, that that is assisting this Court, that Dr. Calas'[s] one time meeting her, being present for the intake review and also reviewing the medical record, that in her opinion [M.M.K.] does lack substantial capacity to understand the proceedings and/or assist in her own defense but she's likely to be restored within the statutory time period, and the Court so finds.

---

[7] This case may present a somewhat unusual scenario for treatment-to-competency cases. As I understand it, in many cases, a motion for involuntary medication will not be filed until after the circuit court has already determined that the defendant is not competent for trial purposes and has committed the defendant to the department's custody for treatment.

¶21    M.M.K. argues that the above-quoted portion of the transcript demonstrates that the circuit court improperly relied on the fact that a motion for involuntary medication had been filed when it found her incompetent. I do not read the court's comments as M.M.K. reads them. Instead, I interpret the court's comments as merely anticipating that Dr. Cohen's future testimony regarding involuntary medication might provide additional support for a determination that M.M.K. was not competent to assist in her defense. The fact that the court commented on the existence of Dr. Cohen's report does not mean that the court unduly relied on that report when it made the competency determination. As explained above, the record shows that the court relied on Dr. Calas's testimony in finding M.M.K. incompetent, not the pending motion for involuntary medication. As such, I reject M.M.K.'s argument and conclude that the circuit court did not erroneously exercise its discretion.

## II

¶22    I now turn to the involuntary medication order, which M.M.K. challenges on two grounds. She argues that the crimes she was charged with are not sufficiently serious to satisfy the first *Sell* factor, and that the treatment plan was not sufficiently individualized to satisfy the remaining factors. As I now explain, the State failed to satisfy its burden of proof on the first *Sell* factor; therefore, I need not address M.M.K.'s arguments about the remaining factors. *See **Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

11

¶23    I begin by restating what has been stated on many occasions. "Under the Due Process Clause [of the United States Constitution], individuals have 'a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs.'" *State v. Fitzgerald*, 2019 WI 69, ¶13, 387 Wis. 2d 384, 929 N.W.2d 165 (citation omitted).  To "override" that liberty interest, it is not enough for the government to prove that the forced administration of medication would be "medically appropriate" and the "only viable hope" for restoring the individual to competency. *See Sell*, 539 U.S. at 174 (citation omitted).  "'Only an essential or overriding state interest' can overcome [the defendant's] constitutionally-protected liberty interest." *Fitzgerald*, 387 Wis. 2d 384, ¶13 (citation omitted).  Indeed, the *Sell* Court noted that it "may be rare" circumstances that justify forced medication "solely for trial competence purposes." *Sell*, 539 U.S. at 180.

¶24    As mentioned, my focus here is on the first *Sell* factor, which addresses the governmental interest at stake.  This factor considers whether the government has an "important" interest in prosecuting M.M.K. for "serious, but nonviolent, crimes." *Sell*, 539 U.S. at 169, 180; *see also State v. Green*, 2021 WI App 18, ¶16, 396 Wis. 2d 658, 957 N.W.2d 583.

¶25    At this point, it is worth belaboring this discussion about the nature of the governmental interest in a treatment-to-competency case, because that is the "particular" interest that must override the defendant's liberty interest in refusing medication. *See Sell*, 539 U.S. at 181.  In such cases, the pertinent governmental interest is *not* to protect M.M.K.—that is, the objective of treatment is *not* to ameliorate the risk that M.M.K.'s untreated mental illness poses to her own safety and wellbeing.  Instead, the pertinent governmental interest is prosecutorial—to remove a barrier (legal incompetency) that makes it unconstitutional to prosecute

M.M.K., thereby allowing the State to move forward with criminal proceedings and potentially to hold M.M.K. criminally responsible for her conduct. This is why the first *Sell* factor turns on whether the crimes that the State wants to prosecute M.M.K. for are "serious," and more specifically, whether they are sufficiently serious to override her liberty interest in refusing medication. *See id.* at 180-81. Additionally, even if we determine the crimes at issue are "serious," we consider whether there are circumstances that mitigate the State's interest in prosecution. *See id.*; *Fitzgerald*, 387 Wis. 2d 384, ¶26; *State v. J.D.B.*, ___ WI App ___, ¶37, ___ Wis. 2d ___, ___ N.W.3d ___.

¶26 Here, in the course of rendering its decision, the circuit court observed that the precedential cases do not provide any "clear definition" of "seriousness" for courts to apply in these situations. That is a fair critique of the case law, and under the circumstances, courts may reasonably perceive a lack of guidance on this important constitutional issue. Indeed, in the two Wisconsin cases that have analyzed and applied the first *Sell* factor, the defendants were charged with battery; thus, there was an aspect of violence to the crimes at issue in those cases. *See J.D.B.*, ___ Wis. 2d ___, ¶53 (under the circumstances, *Sell* did not allow the State to forcibly medicate a defendant charged with battery to a law enforcement officer); *State v. Anderson*, No. 2020AP819-CR, unpublished slip op. (WI App. Mar. 16, 2021), *rev'd on other grounds by* 2023 WI 44, 407 Wis. 2d 428, 990 N.W.2d 771 (under the circumstances, the State could forcibly medicate

a defendant charged with battery).[8]  Consequently, the courts in those cases did not squarely consider the "rare" circumstance that would justify involuntary medication to restore a defendant's competency to be prosecuted for "serious, but nonviolent, crimes."  *See Sell*, 539 U.S. at 169, 180.

¶27     Turning back to M.M.K.'s case, the circuit court explained its decision on the first *Sell* factor as follows:  "Seriousness can be defined in a number of ways and, in this situation," M.M.K.'s "mental illness is manifested by what's essentially a campaign of statements … in violation of a restraining order," which resulted "in the ongoing harassment, intimidation, and illegal violation of [her then-husband's] sanctity and their right to be left alone."  The court acknowledged that M.M.K. had not "directly threatened physical harm," but further stated that her husband "has a right to be free from" such harassment.  The court commented that "any rational and objective person" in his position might be afraid, knowing that M.M.K. "has a serious mental illness and is delusional, and not, frankly, knowing what she's capable of, given her delusional reports and allegations."  Thus, the court explained, "the ongoing and continuous harassment of [M.M.K.'s husband] is serious to the Court."

¶28     I agree with many of the underlying sentiments that the circuit court expressed.  The State has a strong interest in protecting victims of harassment, and

---

[8] We cite this authored, unpublished, one-judge opinion for its persuasive value pursuant to WIS. STAT. RULE 809.23(3)(b).  Notably, after Anderson successfully petitioned for review of the court of appeals' decision, Anderson abandoned his argument about the first *Sell* factor, and the State conceded that it failed to satisfy its burden of proof on the remaining *Sell* factors.  Our supreme court summarily reversed this court's decision on the basis of the State's concession.  *See State v. Anderson*, 2023 WI 44, ¶1, 407 Wis. 2d 428, 990 N.W.2d 771.

14

in prosecuting violations of injunction orders. The charges against M.M.K. are "serious" in the sense that all harassing conduct has the potential to cause serious concerns for the person who is targeted by the harassment, and to disrupt that person's life. Harassing conduct also has the potential to escalate, and should be taken seriously both by law enforcement and the court system alike. These legitimate concerns gain even more force in a situation in which the person accused of harassment has previously been warned against engaging in the conduct, such as through the issuance of an injunction order. For all of these reasons, the State has a substantial interest in protecting victims by enforcing injunction orders and prosecuting conduct that violates those orders.

¶29 Even so, for reasons I now explain, I cannot conclude that the State has met its burden in demonstrating that its interest in prosecuting M.M.K. for this conduct is sufficient to override M.M.K.'s liberty interest in avoiding unwanted medication. In other words, I conclude that the State has not met its burden to demonstrate that the crimes at issue here and the individual facts of these cases are sufficiently serious to satisfy the first *Sell* factor.

¶30 As this court has recently explained, there are two parts to an analysis of the first *Sell* factor. *See **J.D.B.**,* ___ Wis. 2d ___, ¶¶36-37, 39. A court considers whether the legislature deems the crime to be serious, *id.*, ¶36, and also "consider[s] the facts of the individual case in evaluating the State's interest in the prosecution," because "[s]pecial circumstances may lessen the importance of that interest," *id.*, ¶37 (citation omitted).

¶31 When evaluating whether the legislature considers the charged crime to be "serious," courts have considered how the legislature has designated the

15

crime and the maximum amount of incarceration that could be ordered if the defendant were convicted. *See id.*, ¶36; *United States v. Breedlove*, 756 F.3d 1036, 1041 (7th Cir. 2014) ("the maximum statutory penalty reflects at least some measure of legislative judgment regarding the seriousness of a crime"). Applying that approach here, the charges against M.M.K. are for misdemeanors rather than felonies, and the crimes are not included in the list of "serious" crimes found in any Wisconsin statute.[9] And the maximum jail sentence for each of the counts M.M.K. was charged with is nine months. *See* WIS. STAT. §§ 813.125(7), 939.51 (equating a nine-month maximum sentence with a Class A misdemeanor); *cf. United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007) (compiling cases of offenses with maximum penalties of 10, 20, and 50 years that have been considered "serious" for treatment-to-competency purposes).[10]

---

[9] *See* WIS. STAT. §§ 48.685(1)(c), 50.065(1)(e)1. and 2., 969.08(10)(b) (defining "serious crime"); WIS. STAT. §§ 48.415(9m)(b), 302.11(1g), 939.62(2m)(a)2m., 973.0135(1)(b) (defining "serious felony").

[10] In one nonbinding decision of this court, the State cited two federal cases for the proposition that "a crime for which the punishment is over six months is considered a serious crime." *State v. Anderson*, No. 2020AP819-CR, ¶22 (Wis. Ct. App. March 16, 2021) (citing *Baldwin v. New York*, 399 U.S. 66, 70-71 (1970); *United States v. Palmer*, 507 F.3d 300, 304 (5th Cir 2007)). Although the *Anderson* court appeared to find that argument persuasive, I do not. In *Anderson*, the cases that the court cited to support a six-month rule of thumb were considering "seriousness" in an entirely different context—whether the charges were "serious" enough to conclude that the defendant had a constitutional right to a jury trial. *Anderson*, No. 2020AP819-CR, ¶22. For instance, in *Baldwin*, the Court took on the "essential if not wholly satisfactory task" of "determining the line between 'petty' and 'serious' for purposes of the Sixth Amendment right to jury trial," and the Court settled on six months. *Baldwin*, 399 U.S. at 68-69. And in *Palmer*, while the court considered the analysis of seriousness under *Sell*, it similarly relied on cases that analyzed seriousness in the jury trial context. Moreover, the crimes that Palmer had allegedly committed—threatening the life of a law enforcement officer and causing substantial disruption on or near a university campus—do not lend support to the six-month rule of thumb in this context as the crimes were subject to a maximum sentence of 10 years. *Palmer*, 507 F.3d at 303-04.

16

¶32 Moving to the facts of the individual case, M.M.K.'s conduct certainly qualifies as harassing, and it stands to reason that her then-husband would have wanted that conduct to stop. However, while other violations of harassment injunctions might reasonably be characterized as "serious" because the conduct is dangerous or threatening, here, that characterization is not borne out by the allegations in these cases.[11] Indeed, Dr. Cohen specifically testified that, based on her assessment of M.M.K., she did not consider M.M.K. to be dangerous.

¶33 The one factor that weighs in favor of the State's interest in prosecution is the sheer number of alleged violations of the harassment injunction, and the repeated nature of M.M.K.'s conduct. I recognize that, in such circumstances, the State's options to meaningfully enforce an injunction order may be limited, and that the State might conclude that treatment to competency followed by prosecution is necessary to stop M.M.K. from harassing her then-husband—at least for the period of time that she would be unable to engage in the conduct due to her treatment-to-competency status and then, potentially, in jail during the pendency of the criminal proceedings and part of any criminal sentence. However, under the circumstances here, I cannot conclude that this interest is by

---

[11] According to the allegations in the complaints, M.M.K. was charged with the following conduct. In the first case, she was charged with making a social media post stating that her family's information had been sold to human traffickers, and that she needed "to get home to [her] [then-]husband and kids [because her] husband has been struggling mentally and [the human traffickers] used the system to isolate and attack my household." In the second case, she was charged with making and subsequently editing a social media post that stated that her husband was "mentally unstable" and that her child was "being withheld by [the child's] mentally ill father." In the third case, she was again charged with posting that her husband was mentally ill and withholding their child. And in the fourth case, M.M.K. emailed her husband and accused him of being "abusive" and stated that he "need[ed] to get out of [their] house."

17

itself sufficient to override M.M.K.'s liberty interest in avoiding unwanted medication.

## CONCLUSION

*By the Court.*—Orders affirmed; orders reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.